**OVERSEAS PRIVATE INVESTMENT CORPORATION, et al., Plaintiffs,**

v.

**METROPOLITAN DADE COUNTY, Defendant.**

No. 89–0761–CIV.

United States District Court, S.D. Florida.

May 27, 1993.

Francis X. Sexton, Jr., Miami, FL, for plaintiffs.

Robert M. Klein, Debra J. Snow, Stephens, Lynn, Klein & McNicholas, and Patricia D. Parekh, Peters, Robertson, Lax, Parsons & Welcher, Miami, FL, for defendant.

NESBITT, District Judge.

This cause comes before the Court upon Defendant Metropolitan Dade County's ("Dade County") Motion for Judgment NOV and for a New Trial, Dade County's Motion to Limit Judgment to Statutory Cap, Dade County's Motion for Remittitur, and Plaintiffs' Motion for Court to Determine Date From Which Prejudgment Interest Should Accrue.

## BACKGROUND

The instant case arose out of the failure of a papaya crop raised by Plaintiff William Parker ("Parker") on lands owned by Plaintiff Taino Farms, Ltd. ("Taino Farms")[1]. This failure began in July, 1987 and was complete by the end of that year. Prior to that time, the farm had been in operation for several years and was managed by Parker, who also served as sole shareholder and President of the corporation. Plaintiff Overseas Private Investment Corporation ("OPIC") supplied some of the capital used to develop the farm[2]. In particular, OPIC extended to Taino Farms a loan of $502,500 with an interest rate of 12% per annum, upon which Parker served as guarantor. Parker and a local investor named Sir Jack Hayward ("Sir Jack") also guaranteed a $375,000 loan from Barclays Bank to Taino Farms. In exchange for his guarantee, Sir Jack received the right to all of Parker's interest in Taino Farms in the event of a default on the loan.

Plaintiffs attribute the crop failure to sludge—commercially known as Daorganite—that Parker applied to the soil in which the papaya plants were grown. The parties stipulated that Taino Farms purchased 296 tons of sludge from Defendant South Dade Soil and Water Conservation District ("Conservation District") between April 1986 and September 1986 and that, over the same period, Parker applied the sludge to the fields at issue[3]. Plaintiffs also produced evidence that Defendant Metropolitan Dade County ("Dade County") sold the sludge to Conservation District prior to the dates upon which Taino farms purchased the sludge[4].

Following the crop failure in 1987, Taino Farms defaulted on both the OPIC and Barclays loans. As a result, Parker transferred all of his interest in Taino Farms to Sir Jack in 1988 pursuant to the agreement between the two men executed at the time of the Barclays loan[5]. In addition, OPIC sued both Taino Farms and Parker for breach of the OPIC–Taino Farms loan agreement and, in March 1988, obtained a judgment against them in the amount of $532,402.08. OPIC also appointed a receiver to oversee the operations of Taino Farms. On September 30, 1990, OPIC entered an Asset Transfer

1. Taino Farms is a corporation chartered in the Bahamas. The land on which Parker raised the papaya crop at issue is located near Freeport, Grand Bahamas.

2. OPIC is an agency of the United States government and was established under the provisions of the Foreign Assistance Act, 22 U.S.C. § 2191 et seq. OPIC's purpose is to loan money for the development of less-developed foreign countries. The organization maintains its principal office in Washington, D.C.

3. Conservation District is an agency of the State of Florida that operates in Dade County, Florida.

4. Dade County is a local government agency operating in Dade County, Florida.

5. Sir Jack continues to be the sole shareholder in Taino Farms.

Agreement with Taino Farms. Pursuant to the terms of the agreement, OPIC transferred all of its interest in the assets of·Taino Farms back to Taino Farms in exchange for a percentage of the recovery in this litigation and a $250,000 payment from Sir Jack[6].

Plaintiffs filed the instant action on April 13, 1989. The final Amended Complaint contains the following eight counts: 1) breach of contract against Conservation District, 2) breach of express warranty against Conservation District, 3) breach of implied warranty of merchantability against Conservation District, 4) breach of implied warranty of fitness for a particular purpose against Conservation District, 5) strict liability against Conservation District, 6) negligence against Dade County, 7) strict liability against Dade County, and 8) breach of contract against Dade County. The case went to trial in October 1992. During the course of the trial, Plaintiffs and Conservation District reached a settlement and subsequently filed a joint stipulation of settlement. On the basis of this stipulation, the Court dismissed all counts against Conservation District. The case against Dade County went to the jury on all three counts brought against the County. On November 12, 1992, the jury found Dade County liable on all three counts ·and returned a $6.9 million verdict.

### Motion for Judgment NOV and for a New Trial

In its Motion for Judgment NOV and for a New Trial, Dade County asserts that it is entitled to judgment notwithstanding the verdict or a new trial on the ground for the following reasons: 1) the verdict is contrary to the weight of the evidence, 2) Parker received an award in excess of his interest in the litigation, 3) OPIC should not have been included on the verdict form, 4) the jury's award of damages for breach of contract is contrary to law because there was insufficient proof that a contract existed between Dade County and Taino Farms and because the jury was improperly instructed with re-

spect to agency, 5) Plaintiffs[7] failed to mitigate their damages, 6) Plaintiffs failed to notify Dade County of the suit in accordance with Fla.Stat. § 768.28(6), and 7) the special interrogatory verdict form ("verdict form") submitted to the jury was confusing and the jury's answers to the interrogatories are inconsistent. Moreover, entry of judgment based on the verdict form would award Plaintiffs duplicative damages. The Court will examine these allegations seriatim.

■ In a diversity case in federal court, federal law fixes the guidelines governing disposition of a motion for judgment notwithstanding the verdict and a motion for a new trial. *See Nat'l Fire Ins. Co. v. Housing Dev. Co.*, 827 F.2d 1475, 1482 (11th Cir.1987) ("In diversity cases, federal law governs the propriety of motions for directed verdict ..."); *see also, King v. Ford Motor Co.*, 597 F.2d 436, 439 (5th Cir.1979) ("In diversity cases in this circuit, a district court applies the federal, rather than the state, standard for determining whether a party's evidence is sufficient to defeat a motion for a defeated verdict or judgment n.o.v. ..."). In this circuit a court considering a motion for a judgment notwithstanding the verdict (judgment N.O.V.) must consider all of the evidence presented at trial in the light most favorable to the party opposed to the motion. *Watts v. Great Atlantic and Pacific Tea Co., Inc.*, 842 F.2d 307 (11th Cir.1988). The court must also draw all reasonable inferences in favor of that party. *Id.* The court cannot grant the motion unless the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a verdict unfavorable to that party. *Id.* Most importantly, the court cannot reweigh evidence. *Id.* at 310 n. 5.

■ The standard governing disposition of a motion for a new trial is slightly different. As with a motion for judgment N.O.V., the court must construe all evidence and draw all reasonable inferences in favor of the party

---

6. Sir Jack, OPIC, and Parker executed an amendment to the Asset Transfer Agreement shortly before trial. The amendment accords Parker the right to a percentage of the recovery in the litigation.

7. Unless otherwise indicated, "Plaintiffs" refers to Parker, Taino Farms, and OPIC.

opposed to the motion. *Id.* The court may reweigh the evidence, but can only grant a new trial when the great, *not merely the greater,* weight of the evidence does not support the verdict. *Id.* at 310.

## 1) The Weight of the Evidence

Dade County presents the following arguments in support of its position that the weight of the evidence demonstrates that the sludge sold by Dade County was not the cause of the injury to the papaya plants: 1) the sludge was not applied in sufficient quantity or thickness to have caused the damage to the plants, 2) if anaerobic digestion had caused the damage to the plants, the damage should have manifested itself earlier because of the heavy rainfall that occurred in the months immediately after the crop was planted, 3) Dade County complied with all federal and state regulations regarding processing of the sludge, 4) one of Dade County's experts grew healthy papaya plants using seeds of the same type in soil taken from the same areas of Taino Farms to which the sludge had been applied, 5) other plants grew in the soil allegedly damaged by the sludge, 6) the bacteria which Plaintiffs claim underwent anaerobic digestion could not have lived long enough in the sludge to cause damage, and 7) human pathogens are not "phytotoxic" to plants. None of these arguments warrants either a judgment notwithstanding the verdict or a new trial.

### (i) Late Manifestation of Damage

■ Dade County contends that, if the sludge had contained bacteria capable of anaerobic digestion, then the those bacteria would have undergone anaerobic digestion and damaged the papaya plants long before the date on which the damage was first observed. Dade County's contention is based on two sets of facts: 1) the amount of sludge applied, and 2) the climatic conditions in the Bahamas between the time of application and the time of damage. Parker testified that he applied the sludge to the papaya fields at Taino Farms in June, July, and August of 1986 at the rate of two to two and one-half tons per acre [8]. Dade County calculates this to represent less than one quarter of a thimbleful per plant. Temperature and rainfall data covering these months indicates that between three and one-half and ten and one-half inches of rain fell in each of these three months and the average temperatures over the period fell between seventy-seven and eighty-four degrees fahrenheit. Dade County asserts that these conditions would have activated any anaerobic decomposition of the sludge shortly after application of the sludge and that such decomposition would have damaged the plants well before July 1987—the month in which the plants first exhibited signs of illness.

Plaintiffs' evidence, however, supports a plausible explanation for the delay in the damage to the plants. Plaintiffs' expert, Dr. George Fitzpatrick, testified that the presence of pathogenic bacteria in the sludge and the presence of a food source sufficient to sustain reproduction and growth determines *whether* sludge will decompose anaerobically. The thickness in which the sludge is applied is immaterial. Plate counts taken from soil from Taino Farms treated with sludge and other soil from the farm not treated with sludge revealed a substantially higher level of pathogenic bacteria in the sludge treated soil. Dr. Fitzpatrick also testified that the bacteria had a sufficiently plentiful food source to survive and reproduce.

Dr. Fitzpatrick advanced two reasons for the delay in the effect of anaerobic decomposition on the plants. First, although anaerobic decomposition may have begun immediately after the sludge was applied to the soil, the plant seeds had no direct contact with the sludge until well after planting. Parker testified that the dug trenches into which he placed the sludge, a layer of soil of other composition, and the papaya plant seeds. According to Dr. Fitzpatrick, decomposition did not affect the papaya plants until the plants grew roots that reached the area of the soil occupied by the sludge. Prior to that time, the gasses produced by anaerobic decomposition diffused into the soil and failed to reach the plant roots in concentrations sufficient to produce noticeable damage. Once the plant roots reached the sludge,

---

8. Dade County accepts this portion of Parker's testimony as true for purposes of its motion.

however, the gasses travelled directly up the roots, reaching the plants in concentrations sufficient to cause the damage first observed in July 1987.

Second, the period between September 1986 and June 1987 was quite dry. According to Dr. Fitzpatrick, anaerobic digestion occurs in the absence of oxygen. In addition, water can serve as a catalyst for anaerobic digestion in soil because it displaces oxygen. Based on the absence of significant rainfall between September 1986 and June 1987, Dr. Fitzpatrick concluded that minimal anaerobic decomposition occurred in the sludge over that period. As a consequence, minimal gas was released from that decomposition and the effect on the papaya plants was negligible. In June 1987, however, the Bahamas experienced heavy rainfall. That rainfall could have stimulated a great deal of anaerobic decomposition, which could have resulted in the production of a large volume of harmful gasses. The volume of these gasses, combined with the greater accessibility to the plants caused by the fact that many of the plant roots had reached the area of the soil containing the sludge, ruined the papaya crop.

Dr. Fitzpatrick's theory is consistent with Parker's testimony concerning the thickness with which he applied the sludge. According to Parker, the fertilizer spreader that was used to apply the sludge had difficulty turning around at the northern part of each row, causing the sludge to be deposited in larger amounts in the first hundred feet of the northern side of each row than anywhere else on the field. Due to the greater thickness of the sludge in this area, the roots of the plants located in this area probably reached the sludge earlier than plants located in remainder of the field. In corroboration of Dr. Fitzpatrick's theory, Parker testified that, due to the increased concentration of the sludge, all of the papayas in the first hundred feet of the northern side manifested damage some four to five months earlier than the rest of the crop.

(ii) Compliance with Federal and State Regulations

■ Dade County asserts that the sludge could not have caused the damage to the papaya fields at Taino Farms because the county complied with all federal and state regulations concerning the processing of the sludge. In particular, Dade County contends that its treatment of the sludge removed more than forty percent of the volatile solids originally present—a figure in excess of that required by the regulations prescribed by both the United States Environmental Protection Agency ("EPA") and Florida's Department of Environmental Regulation ("DER")[9].

The record contains significant evidence indicating that a reduction in volatile solids on the scale asserted by Dade County does not guarantee that sludge will be free of pathogenic bacteria. Dr. Harold Schmidt, one of Plaintiffs' experts, testified that even if the level of volatile solids in sludge were reduced by as much as fifty percent, the remaining solids would be sufficient to sustain pathogenic bacteria. James Cowgill, one of Dade County's witnesses, concurred. Thus, absent some procedure in Dade County's sludge processing method ensuring the elimination of pathogens, it was reasonable for a jury to conclude that some reduction in the level of volatile solids was not sufficient to prevent the sludge from causing injury to Plaintiffs' papaya plants.

The record is replete with evidence indicating that Dade County's processing method failed to eliminate pathogenic bacteria from the sludge. This evidence includes the testimony of numerous witnesses who tested the processed sludge in 1985 and 1986. These witnesses testified that those tests revealed high levels of pathogens. Moreover, a report prepared for Dade County's Water & Sewer Authority Department in 1985 by the engineering firm of Post, Buckley, Schuh & Jernigan criticized Dade County's processing method as ineffective in thoroughly eliminating from the sludge bacteria capable of an-

---

9. Pathogenic bacteria consume volatile solids in the process of anaerobic digestion. The presence of volatile solids in sludge containing such bacteria is necessary to sustain the bacteria and to enable the bacteria to engage in anaerobic digestion.

aerobic digestion[10]. In addition, Plaintiffs presented evidence that it was stored in "lagoons" in which it was exposed to a great deal of water[11] and that the sludge was wet upon arrival in the Bahamas. Dade County attempted to refute this evidence with the testimony of several witnesses who stated that the sludge was not removed from the lagoons until sufficiently dry and was subsequently exposed to the further drying action of the sun. Dade County also presented evidence that the sludge was forced through a power screen with holes less than one-sixteenth of an inch in diameter. According to Dade County, the sludge would not have passed through the screen if wet. Viewing the foregoing evidence in the light most favorable to Plaintiffs, the Court cannot find that the great weight of the evidence demonstrates that the sludge was sold free of pathogenic bacteria. Rather, the evidence suggests that Dade County's processing system permitted some pathogens to survive and that, although Dade County undertook some efforts to ensure that the sludge was sold dry, those efforts were not entirely successful.

(iii) Growth of Healthy Papaya Plants in Taino Farms Soil

Dade County also contends that an experiment conducted by Dr. Arvel Hunter proved that the sludge could not have caused the damage to the plants. According to Dade County, Dr. Hunter grew healthy papaya in soil taken from the area of Taino Farms in which Plaintiffs' papaya were damaged. He used the same kind of seeds as those employed by Parker at Taino Farms and grew the plants anaerobically and in soil containing varying concentrations of sludge. In addition, and apparently by accident, Dr. Hunter over fertilized some of the plants and failed to give these plants adequate water. The plants exhibited symptoms similar to those observed by Parker at Taino Farms.

On cross-examination, Plaintiffs established that Dr. Hunter did not collect the sludge that he used to perform his experiments until 1991, several years after the crop failure of 1987. The jury could have concluded that, prior to that time, the bacteria had consumed all of the volatile solids in the sludge, had run out of food, and had perished. The jury could thus have concluded that Dr. Hunter's experiments demonstrate that papaya plants can grow in pathogen-free sludge, but do not conclusively demonstrate that the sludge Parker applied to his fields in 1987 did not destroy his papaya crop.

The jury could also have reasonably concluded that Dr. Hunter's experiments fail to prove that overfertilization destroyed the crop. Unlike Parker, Dr. Hunter did not mix the fertilizer with water prior to applying it to the soil and did not use a trickle irrigation system. According to Plaintiffs, the use of water and an irrigation system are important because they help distribute the fertilizer throughout the soil and thereby prevent the fertilizer build up that causes the damage associated with overfertilization. In addition, Plaintiffs produced a number of expert witnesses who testified that the conditions of both the roots of the papaya plants and of the soil were inconsistent with the theory that overfertilization caused the damage to the plants.

(iv) Growth of Other Healthy Plants at Taino Farms

Dade County also contends that other plants, including pepper pots and pine trees, grew on the soil to which the sludge was applied at Taino Farms. Many of these plants may not have commenced growth until after the pathogens in the sludge had exhausted their food supply and were therefore unable to undergo further anaerobic digestion. Moreover, Parker testified that a crop of trellis cucumbers and a crop of cala-

---

10. Dade County attempts to minimize the significance of the report by pointing to the trial testimony of its author, Mr. Ray Bailey. According to Dade County's characterization of Mr. Bailey's testimony, the report was "couched in terms of obtaining a grant, not necessarily as conditions were at the time." The question is not whether a reasonable jury might have doubted that the report was accurate on its own terms, but whether

such a jury could have accepted it on those terms. Certainly, a reasonable jury could have rejected Mr. Bailey's trial testimony and could thus have accepted the report on its face.

11. As noted previously, water displaces oxygen and therefore helps catalyze anaerobic digestion.

baza that were planted in sludge-treated soil at approximately the same time as the papaya also died.

### (v) Bacterial Survival and Phytotoxicity

Finally, Dade County contends that, even if pathogens survived the sludge treatment process, they could not have survived long enough to have caused any damage to the papaya plants at Taino Farms. In any event, Dade County asserts that the pathogens are not "phytotoxic" to plants. As detailed above, however, Plaintiffs produced abundant evidence demonstrating that the sludge may have caused the destruction of the crop. Dade County's mere assertion to the contrary is insufficient to overcome that evidence.

### 2) Parker's Recovery

Dade County's argument that the jury verdict awarding Parker a total of $5.1 million far exceeded the amount of Parker's damages for three reasons: 1) Parker currently has no debt from his association with Taino Farms, 2) Parker can not recover more than the profit projected for 1988 and 1989, and 3) Parker cannot recover any of the lost profits projected by Mr. Yurkerwich as those projections are too speculative.

### (i) Absence of Debt

According to Dade County, Sir Jack Hayward ("Sir Jack") testified at trial that he paid all of Parker's debts and that Parker did not owe anyone any money. Sir Jack also testified that he released Parker from repayment. Dade County concludes that Parker has no debt arising out of his association with Taino Farms and that any damage award based on these debts is improper.

The record offers little support for Dade County's position. Plaintiffs presented evidence of the following: 1) a loan in the amount of $502,000 from Plaintiff the Overseas Private Investment Corporation ("OPIC") to Taino Farms, Ltd. for which Parker served as guarantor, 2) a $400,000 obligation arising out of Parker's February 1985 buyout of Wallace Groves' interest in their partnership, 3) a loan in the amount of $375,000 from Barclays Bank to Taino Farms, Ltd. upon which Parker served as guarantor, 4) a loan from Mr. J.R. Brooks in the amount of $80,000, 5) a loan from Mr. Dick LaPointe in an amount between $20,000 and $154,000, and 6) obligations to Sir Jack totaling $1 million. The evidence established that several of these debts have been extinguished. Parker's liability under the OPIC loan was explicitly extinguished by a document executed by Parker and OPIC on September 30, 1990 and entitled Mutual Release of Claims and Covenant Not to Sue. In addition, Parker testified that Sir Jack repaid Barclays all of the moneys owed on its loan to Taino Farms.

Nothing in the record conclusively establishes that Parker's debt arising out of the Wallace Groves' buyout has been extinguished. Sir Jack testified that he thought Parker had been released from the debt, but was not sure. Further, several witnesses testified that Parker used the salary OPIC paid him to act as caretaker for Taino Farms to service that debt. The jury could have reasonably concluded that Grove's debt had not been extinguished.

The record is silent concerning whether the Brooks and LaPointe loans have been repaid [12]. Although Sir Jack testified that he believed that all of Parker's other creditors had been paid, he was not certain. Moreover, Parker counted these loans among his debts. As with the Groves' debt, the jury could reasonably have concluded that these loans remained outstanding.

Finally, Sir Jack's testimony concerning his alleged release of Parker was ambiguous. At one point, Sir Jack testified that he had released Parker from all of the debts Parker owed him. Later in his testimony, however, Sir Jack stated that he had issued no formal, written release of Parker and merely had a "gentleman's agreement" not to collect on the debt. Based on this testimony, the jury

---

12. The record is ambiguous concerning whether these loans were made to Taino Farms or to Parker and whether Parker was personally obligated under the terms of the loans. Several witnesses, including Parker himself, counted them among his liabilities. As a result, the jury could reasonably have concluded that Parker was personally obligated on the loans and could properly have awarded to compensate him for this liability.

might reasonably have concluded that, while Sir Jack had no present intention to enforce payment of the debt, Parker nonetheless remained legally obligated. The jury might therefore have concluded that Parker was legally indebted to Sir Jack for $1 million and could properly have awarded Parker compensatory damages covering this amount.

(ii) Limitation of Lost Profits Damages

Dade County contends that, in the event that an award for lost profits was proper, that award should have been limited to profits for the years 1988 and 1989. Dade County insists that the evidence it presented at trial that a papaya virus was introduced in Freeport in 1990 and that a destructive hurricane swept through the Bahamas in 1991 demonstrate that a papaya farm could not have operated profitably in that area after 1989.

■ Mr. David Yurkerwich, Plaintiffs' damages expert, testified that he considered the effect of the virus epidemic and the hurricane when making his calculations. Specifically, he testified that he did not reduce his production projections for 1990 because the introduction of the virus into the Bahamas did not prevent papaya farming from continuing. He pointed out that another papaya farm located in the Bahamas sold thousands of pounds of papaya that year. Moreover, he stated that he deducted $478,000 from his lost profits calculation for 1990 to reflect the decline in production and the increase in costs that would have been caused by the hurricane. The Court finds that a reasonable jury could have concluded that Mr. Yurkerwich's calculation accurately reflected the effects that the virus epidemic and the hurricane would have had on Taino Farms profitability and that a damage award including compensation for profits lost after 1989 need not be reduced. .

(iii) Propriety of Lost Profits Award

■ Dade County also contends that the jury's award to Parker must be overturned because Mr. Yurkerwich's estimate of lost profits is overly speculative. According to Florida law, plaintiff is entitled to recover lost profits where the plaintiff can establish that "1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Constr. v. Wharfside Two*, 545 So.2d 1348, 1351 (Fla.1989). The standard is adequate if it provides such certainty as satisfies the mind of a prudent and impartial person. *Electro Services, Inc. v. Exide Corp.*, 847 F.2d 1524 (11th Cir.1988). Proof of a history of profitability is not required and the fact that a business does not have an earnings record does not preclude recovery of lost profits. *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526 (11th Cir.1985). The plaintiff need only provide a "yardstick" by which the amount of lost profits may be measured. *Twyman v. Roell*, 123 Fla. 2, 166 So. 215, 217 (1935). This yardstick may take the form of, among other things, a study of the profits of business operations that are closely comparable to the plaintiff's or expert testimony based on data concerning operational costs in the industry in question and market data regarding the product at issue. *Brod*, 759 F.2d at 1538.

A review of Mr. Yurkerwich's testimony reveals that the model he used to estimate the economic harm suffered by Taino Farms provides a more than adequate yardstick. Mr. Yurkerwich's calculation consisted of: 1) an estimate of the net losses incurred by Taino Farms in developing the farm, 2) an estimate of the lost profits that the operation would have generated had the 1987 crop not been ruined, and 3) an estimate of the prospective value of the business after several years of successful operation. Mr. Yurkerwich's estimate of net losses was based on the financial statements prepared for Taino Farms by the accounting firm of Peat, Marwick. According to Mr. Yurkerwich, this figure represents the sum of the costs Taino Farms expended prior to the destruction of the crop in 1987 less any revenue that the operation collected over that period. Had the operation become profitable in the future, Mr. Yurkerwich stated that Taino Farms would have recovered these costs. However, due to the crop failure and resulting loss of business, Taino lost the ability to produce income, which caused the costs to become permanent losses.

Mr. Yurkerwich estimated lost profits by estimating revenue between 1986 and 1990 and subtracting estimated costs for the same period. He arrived at his revenue estimate by multiplying projected papaya yield by the price per papaya at which the farm could have sold its product. Based on the business plan that Taino Farms presented to OPIC, Mr. Yurkerwich assumed that Taino Farms would expand from a 110 acre operation to 220 acre operation during this period. He also assumed that the farm would cease to be profitable after December 1989 due to a hurricane that struck the Bahamas that year, but assumed that the farm could have been replanted and could have returned to profitability.

On cross examination, both Dade County and Defendant South Dade Soil and Water Conservation District ("Conservation District") [13] raised several objections to Mr. Yurkerwich's lost profits estimate. First, counsel for Defendants questioned the accuracy of Mr. Yurkerwich's yield projections. In particular, counsel for Conservation District established through questioning that Mr. Yurkerwich failed to consult all of the other papaya growers in the Bahamas when making his yield projections. This failure, however, does not conclusively establish that Mr. Yurkerwich projections were inaccurate. Mr. Yurkerwich testified that he compared three statistics—the USDA's calculation of the average per yield per acre per year (23,000 pounds per acre per year), OPIC's assumption concerning yield per acre per yield (22,730 pounds per acre per year), and the historical experience of another papaya farmer in the Bahamas (80,000 per acre per year). Mr. Yurkerwich then adopted the smallest of these figures. Given the disparity between the figures, Mr. Yurkerwich may have actually underestimated the yield that Taino Farms would have realized. The disparity certainly suggests that he did not overestimate it.

Second, Defendants' counsel questioned the accuracy of Mr. Yurkerwich's estimates of the price at which Taino Farms could have sold its papaya. Mr. Yurkerwich's price estimates were based on data gathered by the USDA between 1986 and 1990. These data were gathered directly from markets in which papaya were sold in various cities throughout the country. Based on these data, Mr. Yurkerwich developed an average wholesale price over the relevant period for each of the cities in which Taino Farms had previously sold papaya. Counsel for Conservation District suggested that the USDA data were based on Hawaiian papaya and that there are "substantial differences" between papaya grown in Hawaii and those grown in the Bahamas. Neither Defendant produced any evidence concerning these differences or why they might have affected the prices at which Taino Farms could have sold its papaya.

Third, Defendants questioned whether Mr. Yurkerwich adequately considered the effect of the 1989 virus epidemic and hurricane. As noted above, however, Mr. Yurkerwich testified that at least one papaya farm in the Bahamas sold hundreds of thousands of pounds of papaya during the virus epidemic. Moreover, Mr. Yurkerwich did not include profit projections for any period after the hurricane in the lost profits estimate that was submitted to the jury.

Finally, counsel for Dade County repeatedly pointed out that Taino Farms failed to make a profit in all but one of the quarters considered by Mr. Yurkerwich. As noted, however, a plaintiff does not have to demonstrate a history of profitability in order to sustain a claim for lost profits. Moreover, according to both Mr. Yurkerwich and several other witnesses for Plaintiffs, Taino Farms lack of profitability was attributable to expenses necessary to bring in the crop ruined in 1987. Mr. Yurkerwich's calculations reveal that, had that crop been successfully harvested, the revenues realized from the sale of the crop would have been sufficient to cover both those expenses and the expenses associated with expansion of the operation and would still have yielded a profit. The Court concludes that Mr. Yurkerwich's testimony provides an adequate yardstick for the measurement of lost profits.

---

13. Conservation District settled shortly after Mr. Yurkerwich's testimony.

Mr. Yurkerwich's testimony also serves as an adequate measure of the lost business value of Taino Farms. In arriving at this measurement, Mr. Yurkerwich assumed that Taino Farms would have operated profitably had the crop not been destroyed in 1987. His estimate of profitability was identical to that described above. According to that estimate, Taino Farms would have averaged $1.448 million in profits annually after several years of operation. Mr. Yurkerwich then assumed that, due to the risks associated with a papaya farming business in the Bahamas,[14] a prudent investor would demand a forty percent return on his or her investment. Accordingly, Mr. Yurkerwich concluded that such an investor would have paid $3.6 million to buy Taino Farms after several years of profitable operation.

On cross examination, Defendants raised a number of questions concerning Mr. Yurkerwich's analysis. First, Defendants again pointed to Taino Farms failure to sustain profitability. That concern has been discussed above. Second, Defendants suggested that the level of risk associated with papaya farming would have deterred most prudent investors from purchasing the business. Mr. Yurkerwich testified that several investors had expressed an interest in Taino Farms prior to the crop failure in 1987—before the business had sustained profitability for more than a single quarter. Moreover, Defendants produced no evidence concerning the level of investment risk that most investors consider acceptable. As a result, Defendants deterrence argument rests on mere assertion.

■ The Court concludes that a reasonable jury could have accepted Mr. Yurkerwich's estimate of net losses, lost profits, and lost business value as accurate and finds that the estimate was not contrary to the great weight of the evidence. Accordingly, the Court finds that the record contains sufficient to sustain the full amount of the jury's award to Parker. On the basis of the evidence, the jury could reasonably have found that Parker was liable for well over $1 million in debt and that, as President and sole shareholder of Taino Farms, Ltd., he suffered over $8 million in economic harm.[15] Viewed in this light, the jury's decision to award Parker a total of $5.1 million seems perfectly reasonable.

### 3) OPIC's Recovery

Dade County next contends that the jury's award to OPIC substantially exceeded the maximum amount which OPIC was legally entitled to recover. According to Dade County, the terms of the Asset Transfer Agreement between OPIC and Sir Jack limit the amount to $263,066.41, while the jury awarded OPIC $610,000.

Under the terms of the agreement entered between OPIC and Sir Jack on September 30, 1990, Sir Jack agreed to pay OPIC $250,000, in partial satisfaction of Taino Farms debt to OPIC. That debt consisted of a loan of $502,000 at 12% interest. At the time of the agreement, the principal and interest totaled $864,351.46. *In section 2.1(a), the agreement specifically identifies this figure as the outstanding loan amount.* The agreement also allocates prospective recovery in the instant litigation between OPIC and Taino Farms.[16] Under section 3.2 of the agreement, OPIC has a priority to the first $10,566.41 of the recovery. The parties are to share equally in any recovery beyond that amount until OPIC recovers the full amount

---

14. These risks include crop disease and hurricanes.

15. Dade County urges the Court to reduce the amount of damages attributable to economic harm to present value. Damages for past harm do not need to be reduced to present value, however. Mr. Yurkerwich's estimates concerning economic harm were based on *past* economic harm. The net losses estimated occurred prior to the loss of the papaya crop. Further, he estimated lost profits through 1990 and also estimated lost business as of that year.

16. At the time of the agreement, Sir Jack held all of the shares in Taino Farms, Ltd. Pursuant to an agreement that the two men entered at the time of the Barclays loan to Taino Farms, Parker transferred his interest to Sir Jack when Barclays Bank called Sir Jack's guarantee of the loan. Thus, Sir Jack's actions with respect to the OPIC debt were of direct benefit to his own interest in Taino Farms.

of its loan to Taino Farms.[17] Based on these terms, OPIC is entitled to recover the full amount of the loan as specified in the Asset Transfer Agreement less the amount of the Hayward payment of $250,000—i.e., $614,-351.46. The jury's actual award to OPIC totals $610,000.

Even though the Asset Transfer Agreement was not introduced at trial, the evidence presented contained the figures necessary to enable the jury to calculate OPIC's damages in accordance with the preceding analysis. Dade County introduced as Defendant's Exhibit 23 the Mutual Release of Claims and Covenant Not to Sue ("Mutual Release") to which OPIC and Parker agreed on the same date the Asset Transfer Agreement. The Mutual Release states that OPIC has obtained a judgment against Parker in the amount of $864,351.46 arising out of the loan that OPIC extended to Taino Farms. Thus, the jury could have concluded that the loan with interest totaled $864,351.46. The Mutual Agreement also states that OPIC reached an agreement with Sir Jack Hayward for the immediate repayment of a portion of the loan. The Court's instructions to the jury incorporated the parties' stipulation that the amount paid by Sir Jack to OPIC was $250,000. As a result, the jury could easily have concluded that $614,351.46 remained outstanding on the OPIC loan. The jury's decision to award OPIC $610,000 reflects a clear understanding of the amount which OPIC could recover. The Court concludes that OPIC is entitled to the full amount of the jury's award.

4) Agency and Breach of Contract

Dade County contends that the Court should not have submitted Plaintiffs' breach of contract claim to the jury. According to Plaintiffs' theory, Conservation District acted as Dade County's agent and entered a contract with Taino Farms on behalf of Dade County as undisclosed principal. According to Dade County, Plaintiffs failed to present evidence sufficient to establish either the existence of an agency relationship between Conservation District and Dade County or the existence of a contract between Conservation District and Taino Farms. Dade County also contends that the Court failed to instruct the jury properly with respect to agency.

(i) Agency

▮▮▮▮ Under Florida law, the party asserting the existence of an agency relationship must prove (1) an acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent. *Goldschmidt v. Holman*, 571 So.2d 422 (Fla.1990). An agent's authority to act on behalf of the principal may be inferred from acts, conduct, and other circumstances and an agency relationship may be found to exist even if both the principal and the agent deny the existence of the relationship. *Fincannon v. Eastern Airlines*, 611 So.2d 28 (Fla.App. 1st Dist.1992). Where the evidence concerning the existence of an agency relationship is susceptible to more than one interpretation, the question whether such a relationship exists must be submitted to the jury. *Bona v. Peoples Gas System, Inc.*, 557 So.2d 581 (Fla.App. 3rd Dist.1989).

Dade County urges that Plaintiffs presented insufficient evidence that it exercised control over Conservation District to warrant submission of the agency question to the jury. A review of the evidence reveals that, while Dade County produced a substantial amount of evidence that it exercised no such control, Plaintiffs introduced sufficient evidence to the contrary. Dade County relied primarily on the testimony of Mr. James Cowgill, an employee of Dade County. Mr. Cowgill testified that Dade County did not exercise any control over the manner in which Conservation District marketed its sludge, the price at which Conservation District sold the sludge, the parties to whom

---

17. The amendment to the Asset Transfer Agreement executed by Parker, OPIC, and Taino Farms also provides that OPIC has priority to the first $10,566.41 of any recovery and that any recovery beyond that amount will be allocated according to the following schedule until OPIC recovers the full amount of its loan to Taino Farms:

| | | |
|---|---|---|
| (i) | Taino Farms | 40% |
| (ii) | OPIC | 40% |
| (iii) | Parker | 20% |

Conservation District made its sales. Mr. Cowgill also testified that Dade County exercised no control over the management of Conservation District and "gave no indicia or insignia to ... (Conservation District) to act as its agent."

■ Plaintiffs introduced the contract between Dade County and Conservation District, however, which presents a different picture (Plaintiffs' Exhibit 21). The terms of the contract require Conservation District to screen the sludge of inert material, to comply with all federal and state regulations concerning processing of the sludge, to apply the sludge for buyers of the sludge, and to "monitor" sludge application sites. Moreover, the terms of Amendment Number Four to the agreement obligate Conservation District to purchase and remove specified quantities of sludge within time periods set forth in the amendment.[18] Finally, a letter dated July 1, 1985 from Mr. Cowgill to Mr. Robert Fergen, Dade County's Special Projects Engineer, indicates that Dade County monitored Conservation District's progress in selling the sludge to third parties. As these contractual terms impose a significant burden on Conservation District, a reasonable jury could conclude that Dade County insisted upon the inclusion of these terms in the contract and thereby exercised control over the nature and volume of the sludge that Conservation District ultimately sold to third parties.[19]

■ Based on the foregoing, the Court concludes that the agency issue was properly submitted to the jury. Case law in Florida makes clear that the court should rarely remove the issue from jury consideration. In the case relied upon by Dade County, *Goldschmidt v. Holman*, the Florida Supreme Court upheld the trial court's refusal to instruct the jury on agency where the plaintiff failed to plead agency and to produce at trial any evidence of agency. *See Goldschmidt*, 571 So.2d at 424. The present case is entirely different. Plaintiffs plead agency in Count VIII of the Complaint and produced evidence upon which a reasonable jury might have found in their favor. The fact that Mr. Cowgill, an employee of one of the parties to the agency relationship, maintained that no such relationship existed does not resolve the issue in the face of contrary evidence. *See Fincannon*, 611 So.2d at 30–31.

The Court also concludes that it properly instructed the jury on agency. The Court utilized the standard jury charge on agency in Florida, set out in 1 Florida Forms of Jury Instruction § 10.05 (1992). Dade County has failed to identify any reason why the charge was legally inaccurate or why it was inappropriate in the context of the case.

(ii) Existence of a Contract

■ Notwithstanding agency, Dade County urges that the Court should vacate the jury's award of damages to Plaintiffs for breach of contract for three reasons: 1) the evidence submitted by Plaintiffs regarding the contract fails to establish with certainty any of the essential elements of a contract—including the quantity of sludge covered by the contract, the time for payment, the manner in which the sludge was to be transported, and the time for delivery, 2) Dade County contends that it had no opportunity to obtain evidence from Conservation District because Conservation District settled prior to Dade County's presentation of its case, and 3) Plaintiffs' settlement with Conservation District has already compensated them for any damages arising out of the breach of contract.

Under both the Uniform Commercial Code ("U.C.C.") and the common law, Plaintiffs produced sufficient evidence of the elements

---

18. The amendment also included price reductions for additional quantities purchased.

19. Several of the amendments to the agreement provide evidence that Dade County exercised some financial control over Conservation District. In an amendment executed on May 20, 1986, for instance, Dade County loaned Conservation District more than two thirds of the funds required to pay for a study to determine whether the application of the sludge within Dade County would effect water quality in the county. The terms of the loan required Conservation District to pay the full balance owed for the first year of the study within seven days after receiving the loan proceeds and adjusted the price at which Conservation District was obligated to purchase sludge.

of a contract to warrant submission of the question whether a contract existed to the jury. In explaining the common law in Florida, the Florida Supreme Court stated that:

> Even though all the details are not definitely fixed, an agreement may be binding *if the parties agree on the essential terms and seriously understand and intend the agreement to be binding upon them.*
>
> The courts should be extremely hesitant in holding a contract void for indefiniteness, particularly where one party has performed under the contract and allowed the other party to obtain the benefit of his performance.... The contract should not be held void for uncertainty unless there is no other way out.... Indefiniteness much reach the point where construction becomes futile.

*Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.,* 302 So.2d 404 (Fla. 1974) (emphasis added). The U.C.C. requires even less. Section 672.204(3) of the Florida Statutes provides that:

> Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Fla.Stat.Ann. § 672.204(3).

■ Dade County's argument concerning the absence of essential terms is meritless. In Florida, a contract may consist of more than one document. *See International Ship Repair v. Gen. Portland, Inc.,* 469 So.2d 817 (Fla.App. 2nd Dist.1985). In the event that a contract consists of more than one document, the documents must be construed together. *Id.* Plaintiffs introduced invoices prepared by Conservation District for the purchase by Taino Farms of various quantities of sludge. The invoices fix the price for each purchase, specify the quantity to be delivered, and include a price delivery term fixing the place of delivery.[20] Read collectively, the invoices

fix the subject matter of the contract as sludge and specify the quantity of the sludge to be delivered and the price to be paid for the sludge. Moreover, the price-delivery term fixes the seller's obligations with respect to place of delivery. The only terms absent are terms covering time and manner of delivery and time and manner of payment, which are not essential to the formation of a contract.[21] In addition, Plaintiffs introduced a document entitled "Land Application Field Package for Grade I Sludges" which was signed by representatives from Dade County, Conservation District, and Taino Farms. Under D.E.R. regulations, such a form must be prepared in connection with every sale of sludge to agricultural farmers. Thus, the fact that Conservation District, Dade County, and Taino Farms executed the form strongly suggests that they intended to engage in such a sale. The Court concludes that Plaintiffs produced sufficient evidence from which a reasonable jury could have concluded a contract existed between Taino Farms and Dade County.

Dade County's argument that it was denied an opportunity to present evidence concerning the contract because Conservation District settled prior to the presentation of Dade County's case is also meritless. Plaintiffs added their breach of contract claim against Dade County to their Complaint more than one year prior to trial. Dade County could have called representatives of Conservation District to testify at trial and must now accept the consequences of its failure to do so.

■ Finally, Dade County contends that Plaintiffs have already recovered for breach of contract through the payment made to them by Conservation District under the settlement agreement.[22] The settlement agreement between Plaintiffs and Conservation District did not preclude litigation of Plaintiffs' breach of contract claim against Dade

---

20. Each of the invoices includes the price delivery term "F.O.B. Homestead".

21. Under the U.C.C., for instance, if the contract fails to specify a time for delivery and a time for payment, then delivery must occur within a reasonable time after the formation of the contract and payment is due at the time and place at which the buyer is to receive the goods. *See* Fla.Stat.Ann. §§ 672.309, 672.310.

22. Reduction of the verdict by the amount of the settlement agreement is addressed *infra.*

County. In *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990), the Eleventh Circuit held that the following four elements must be present in order to sustain claim preclusion: 1) there must be a final judgment on the merits, 2) the decision must be rendered by a court of competent jurisdiction, 3) the parties, or those in privity with them, must be identical in both suit, and 4) the same cause of action must be involved in both cases.

The facts of the present case fail to satisfy all of these requirements. The parties to the settlement filed a stipulation of settlement. On the basis of the stipulation, the Court entered an Order dated January 12, 1993, dismissing the action against Conservation District with prejudice. Under *Citibank*, that order constitutes a final judgment for purposes of claim preclusion. Further, the Court properly exercised diversity jurisdiction over the case. *See* 904 F.2d at 1501–1502. The facts thus satisfy the first two elements of *Citibank*.

The facts fail to satisfy the third element, however, as Dade County and Conservation District are not in privity with one another. In *Citibank*, the Eleventh Circuit held that a final judgment exonerating an agent of liability precludes prosecution of the same claim against the principal *if the action against the principal is based solely on a theory of respondeat superior or vicarious liability. Id.* at 1502. Under this rule, if the plaintiff alleges that the principal performed no independent action and is liable solely vicariously, then if the agent's actions do not render the agent liable, they cannot render the principal liable. The Eleventh Circuit summarized this holding in the context of the facts of *Citibank* with the following language:

> When a person suffers injury as a result of the concurrent or consecutive acts of two or more persons, he has a claim against each of them.... Accordingly, a judgment for or against one obligor does not

result in the merger or bar of the claim that the injured person may have against another obligor.... However, since Data Lease, in its counterclaim, is seeking damages against Citibank only under the theory of respondeat superior or vicarious liability, Data Lease does not claim any injury from "concurrent or consecutive acts" of Citibank; rather, *Data Lease seeks damages from Citibank solely on the basis of the alleged wrongful acts of its agents....* Accordingly, we conclude that the third element of claim preclusion, i.e., privity, is met herein.

*Id.* at 1502 (emphasis added).

▬ In the present case, Plaintiffs clearly allege that Dade County breached its contract with Taino farms through its own actions. In particular, Count VIII of the Complaint—Plaintiffs breach of contract count against Dade County—alleges that Dade County exercised control of the processing of the sludge, that Dade County failed to process the sludge properly, and that as a result, Dade County provided Taino Farms with sludge that failed to meet the terms of the contract.[23] Dade County's liability to Plaintiffs thus arises out of both its own actions and subsequent actions taken by Conservation District. Moreover, Count VIII asserts that Dade County is liable as a principal to the contract. The count is not based on respondeat superior or vicarious liability. The Court concludes that Dade County is not in privity with Conservation District within the meaning of *Citibank*.

In addition, Plaintiffs' breach of contract claim against Dade County constitutes a different cause of action than Plaintiffs' breach of contract claim against Conservation District. In Count I, Plaintiffs allege that a contract existed between Taino Farms and Conservation District and that Conservation District was a principal to the contract. In Count VIII, based on the same facts, Plaintiffs allege that a contract existed between

23. Paragraph 99 of the Complaint alleges that Dade County controlled sludge processing by: 1) performing a sludge analysis and grading of the Daorganite sold to Plaintiffs as required by Chapter 17–7 of the Florida Administrative Code through Miami Dade Water and Sewer Department, 2) weighing shipments of Daorganite before Conservation District transported the material, 3) loading the Daorganite onto Conservation District's trucks at the Central District Wastewater Treatment Plant, 4) funding Conservation District's purchase of equipment essential to the Daorganite production process, and 5) funding studies associated with use of Daorganite.

Taino Farms and Dade County as undisclosed principal and allege that Conservation District served as Dade County's agent. Either Conservation District was a principal *or* it was Dade County's agent—it could not have been both. The counts represent alternative theories based on the same set of facts and therefore constitute distinct causes of action.[24] Based on the foregoing, the Court finds that neither the third or fourth elements of claim preclusion are satisfied by the facts of the instant case.

### 5) Mitigation

█ Dade County contends that the Court must reduce Plaintiffs' recovery on the ground that the jury either disregarded or misunderstood the Court's instructions regarding mitigation of damages and the doctrine of avoidable consequences. According to Dade County, the county produced uncontroverted evidence that Parker made no effort to revive the damaged papaya crop, to replant the crop, to reuse the land or farm, or to resell the farm equipment.

Dade County's assertion that the jury did not consider this evidence is not supported by the record. The jury awarded Plaintiffs an amount significantly lower than the amount claimed by Plaintiffs and supported by the evidence Plaintiffs produced.[25] The facts thus suggest that the jury considered the Court's instructions regarding mitigation and the doctrine of avoidable consequences

and reduced Plaintiffs' recovery in accordance with these instructions.

### 6) Notice

Dade County urges as a bar to recovery that Plaintiffs failed to allege and demonstrate adequate notice to the Department of Insurance as required by Fla.Stat. § 768.-28(6)(a). The Court ruled against Dade County with respect to this issue in an order dated October 28, 1991 (D.E. # 223), and no valid reason has been presented to revisit this issue.

### 7) Inconsistent Verdicts and Duplicative Damages

Dade County also contends that it is entitled to a new trial on the following two grounds: 1) the verdicts with respect to the individual causes of action are inconsistent because the jury assessed damages differently for each of the three counts, despite the fact that the proof of damages was identical for each of the counts and 2) the jury awarded duplicative damages. The Court will address each of these contentions separately below.

#### (i) Inconsistent Verdicts

The injuries suffered by Plaintiffs were all derived from the same cause—the allegedly defective nature of the sludge.[26] Moreover, Plaintiffs failed to link any of the theories with a particular aspect of the damage caused. Dade County concludes that any damage assessment must necessarily yield the same figure for each of the counts.[27] The

---

24. The Court notes that the settlement between Conservation District and Plaintiffs did not fix Conservation District's role in the transaction as that of agent. Under *Citibank*, a settlement agreement may result in claim preclusion, but will ordinarily not result in issue preclusion. 904 F.2d at 1504.

25. As noted previously, Plaintiffs produced evidence that they suffered in excess of $8 million in damages. The jury awarded a total of $6.9 million.

26. Under their strict liability theory, Plaintiffs asserted that the sludge was defective. Under their negligence theory, Plaintiffs asserted that Dade County was negligent in failing to process the sludge so that it was not defective at the time the county sold it. Finally, under their breach of contract theory, Plaintiffs asserted that Dade County breached its contract with Taino Farms by supplying the farms with defective sludge.

Thus, each of Plaintiffs' theories of liability centered on the defectiveness of the sludge.

27. In strict liability, a plaintiff is entitled to recover all damages proximately caused by the defective nature of the product, while in negligence, a plaintiff is entitled to recover all damages proximately caused by the defendant's breach of its duty of care to the plaintiff. *See, Lake Parker Mall, Inc. v. Carson*, 327 So.2d 121 (Fla.App.Ct. 2nd Dist.1976); *West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla.1976). Dade County's breach of duty consisted of supplying the plaintiff with defective sludge. As Plaintiffs did not link Dade County's breach of duty with any particular aspect of the damages proved, the damage measures for the two torts must be identical. Under both theories, Plaintiffs are entitled to recover all damages proximately caused by the defective nature of the product.

As to the breach of contract claim, Plaintiffs were entitled to recover all damages foreseeably

jury verdict, however, reflects a discrepancy between damage awards. In particular, the jury awarded Plaintiffs $6.8 million under the strict liability count and a total of $100,000 under the negligence and breach of contract counts. Dade County concludes that the verdict are inconsistent and must be the product of jury confusion. Dade County therefore requests that the Court order a new trial.

■ Under the law of this circuit, a party objecting to a jury's verdicts on the ground of inconsistency must both raise the objection prior to the discharge of the jury that rendered the verdicts and must request that the trial judge resubmit the verdict forms to that jury for further consideration. *See Geneva County Bd. of Educ. v. CNA Ins. Co.*, 874 F.2d 1491, 1497 n. 6 (11th Cir.1989) ("Because CNA did not object to the district court's charging the jury on both the contract and fraud claims, did not object to the form or content of the written questions submitted to the jury, and *failed to request that the case be resubmitted to the jury upon its returning inconsistent verdicts, CNA waived the issue on appeal ...*" (emphasis added)); *see also Golub v. J.W. Gant & Assoc.*, 863 F.2d 1516, 1521 (11th Cir.1989). The purpose of the latter requirement of the rule is to ensure that the district judge is aware that he or she may resubmit the verdict forms to the jury, while the purpose of the rule as a whole is to permit the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury. *See Lockard v. Missouri Pacific R. Co.*, 894 F.2d 299 (8th Cir.1990); *see also, Skillin v. Kimball*, 643 F.2d 19 ("to allow a new trial after the objecting party failed to seek a proper remedy at the only possible time ... would allow the possible misuse of Rule 49 procedure ... by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them.")

■ In the present case, Dade County raised the issue that the jury verdicts in strict liability and negligence were inconsistent after the rendition of those verdicts.[28] At no time did Dade County's counsel request that the Court resubmit the verdict form to the jury for reconsideration, despite the fact that the Court inquired of him at least three times whether he wished to raise any other matters before the jury was discharged. Further, the jury had originally been given a verdict form without a request for the total damages to be awarded.[29] The jury returned this verdict form with virtually the same discrepancy that appeared on the final verdict form. Thus, from the time that the Court presented the original verdict form to counsel, counsel for Dade County was on notice of the possibility that the jury would return a verdict containing a discrepancy between the amounts awarded under the three theories of recovery. Counsel therefore had ample opportunity to investigate the law regarding inconsistent verdicts and to discover the requirement that he request that the Court resubmit the verdict form to the jury. By failing to make such a request, counsel waived any objection to the inconsistency of the verdict.

---

caused by the defendant's breach of contract. *See Knowles v. C.I.T. Corp.*, 346 So.2d 1042 (Fla. App.Ct. 1st Dist.1977). Dade County's alleged breach of contract in the present case consisted of supplying the plaintiff with defective sludge. Foreseeability and proximate cause are interchangeable concepts, since proximate cause is limited by foreseeability. It follows that, Plaintiffs are entitled to recover all damages proximately caused by the defective nature of the sludge, precisely the same damage measure governing negligence and strict liability.

28. The following exchange occurred as part of the colloquy that ensued following the recitation of the verdicts:

The Court: Mr. Welcher, do you have any other matters other than not liking the amounts, but do you ...

Mr. Welcher: Yes, I have some other matters that disturbed me very much and that is the amounts they have put in for strict liability. To my way of thinking it is absolutely inconsistent that the damages for strict liability could be different than those for negligence.

The Court: Well, that may be an interesting appellate question.

Mr. Welcher: It may very well.

29. The Court subsequently submitted a clean copy of the verdict form to the jury with an additional page attached. The Court instructed the jury to reconsider its awards with respect to the individual counts and also to write its assessment of Plaintiffs' total damages on the additional page. The completed version of this second form is the final verdict form.

### (ii) Duplicative Damages

Dade County also contends that it is entitled to a new trial on the ground that the verdict form indicates that the jury awarded damages under three different theories for the same injury—the damages caused by the defective nature of the sludge—and then aggregated these damage awards. Dade County concludes that entry of judgment based on the verdict form would afford Plaintiffs a duplicative recovery.

 The jury was instructed to not aggregate or apportion damages covering the claims [30] and was asked to render a total damage award. The jury clearly disobeyed this instruction and there is therefore a serious risk that the jury's awards in negligence and breach of contract are duplicative of damages already awarded in strict liability. Accordingly, the Court will enter judgment only for the strict liability claim.

The Court will also reduce the amount of Plaintiffs' recovery pro rata by the amount of the settlement between Plaintiffs and Conservation District in accordance with Florida law. *See Fla. Min. & Materials v. Van Antwerp*, 601 So.2d 621 (Fla.App.Ct. 2nd Dist.1992); *see also, Young Manuf. Inc. v. Brooks*, 543 So.2d 388 (Fla.App. 3rd Dist. 1989).

Accordingly, judgment shall be entered in favor of Plaintiffs and against Dade County in the total amount of $6,675,000, which shall be set forth in a separate judgment pursuant to Fed.R.Civ.P. 58. Dade County's motion for JNOV and motion for a new trial are DENIED. Plaintiffs' Motion to File Opposition to Supplemental Case law in Support of Dade County's Motions is DENIED as moot.

### Motion for Remittitur

 Dade County also moves for a remittitur of the verdict. The law in this circuit concerning remittitur is clear. A jury verdict is not to be set aside unless it is so exorbitant as to shock the judicial conscience or indicate bias, passion, prejudice, or other improper motive on the part of the jury. *Goldstein v. Manhatten Industries, Inc.*, 758 F.2d 1435 (11th Cir.1985). If the verdict proves to be excessive under this standard, it is within the discretion of the trial court to determine whether the excessiveness of the verdict warrants a new trial or a remittitur. *Id.* at 1448. If the trial court determines that remittitur is the appropriate remedy, then the court must reduce the jury's verdict to the outer limit of the plaintiff's proof. *Id.*

The Court does not find the jury's verdict to be excessive in the instant case. For the reasons detailed above, the Court finds that the jury's verdict is fully consistent with the evidence Plaintiffs adduced at trial. Accordingly, Dade County's motion for remittitur is DENIED.

### Motion to Limit Judgment to Statutory Cap

In its Motion to Limit Judgment to Statutory Cap, Dade County requests that the Court reduce the $100,000 maximum fixed by Fla.Stat.Ann. § 768.28(5). That provision limits the tort liability and its agencies and subdivisions to $100,000 with respect to a claim brought by any one person and to $200,000 with respect to all claims arising out of the same incident or occurrence.[31] Plain-

---

**30.** Specifically, the Court stated that:

However, having said that, the plaintiff is entitled to one recovery. That is to say, you cannot aggregate or start apportioning the claims, the damage amount in your mind to reach a total amount. You must make a determination of the amount of damages, if any, that you believe is appropriate as to each claim and as to each count.

**31.** Section 768.28(5) provides that:

The state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances, but liability shall not include punitive damages or interest for the peri-

od before judgment. Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $100,000 or any claim or judgment, or portions thereof, which, when totaled with other claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence, exceeds the sum $200,000. However, a judgment or judgments may be claimed or rendered in excess of these amounts and may be settled and paid pursuant to this act up to $100,000 or $200,000 as the case may be; and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature.

tiffs oppose the motion on the substantive, procedural, and statutory grounds. These grounds include the following: 1) OPIC is an agency of the federal government and the State of Florida cannot limit recovery by the federal government, 2) the statutory cap does not apply where a contract claim is involved, 3) Dade County waived its right to assert the limitation of liability by failing to raise this issue in its three motions for directed verdict, 4) the plain language of the statute allows the entry of judgment in excess of the cap, 5) judgment should not be limited to the cap because Plaintiffs are permitted to seek a legislative claims bill to recover in excess of the cap, and 6) the statutory cap is not a limit on recovery where the state has liability insurance.

■ The Court finds that the plain language of the statute authorizes entry of a judgment in excess of the cap and that Plaintiffs may seek a legislative claims bill to recover the excess. The Court therefore does not reach Plaintiffs' other arguments. Section 768.28(5) provides, in relevant part, that:

> [A] judgment or judgments may be ... rendered in excess of these (the cap) amounts ... and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature.

This language unequivocally authorizes entry of a judgment in excess of the cap. The cases that have examined the language confirm this conclusion. *Michigan Millers Mut. Ins. Co. v. Bourke*, 607 So.2d 418, 422 (Fla. 1992) ("[S]ection 768.28(5) authorizes the rendition of a judgment in excess of the amount the State can be required to pay due to sovereign immunity"); *Gerard v. Dep't of Transportation*, 472 So.2d 1170, 1172 (Fla. 1985) (overruling First District Court of Appeals decision that section 768.28(5) only authorizes judgments in excess of cap where the State has waived sovereign immunity); *Berek v. Metropolitan Dade County*, 422 So.2d 838 (Fla.1982) ("[S]ection 768.28(5) authorizes the rendition of judgment in excess of the maximum amount which the state can be required to pay. The purpose of this provision is so that the excess can be reported to the legislature and then paid in whole or in part by further act of the legislature. These provisions recognize that the judgment and post-judgment assessments to be entered of record should upon motion of the plaintiff be the full amount of actual damages suffered, costs, and post judgment interest and not the amount of the defendant's liability."). Accordingly, Dade County's motion to limit judgment to statutory cap is DENIED.

*Motion for Court to Determine Date From Which Prejudgment Interest Should Accrue*

In their Motion for Court to Determine Date From Which Prejudgment Interest Should Accrue, Plaintiffs request that the Court fix December 1, 1987 as the date from which to date prejudgment interest on their judgment against Dade County. Dade County responds that, under Florida law, a plaintiff is not entitled to prejudgment interest on an unliquidated and that Plaintiffs' losses were unliquidated at the time Plaintiffs experienced the losses. Dade County also contends that Florida law precludes an award of prejudgment interest on a tort claim. The county concludes that Plaintiffs are not entitled to an award of prejudgment interest.

■ Florida law permits recovery of prejudgment interest on a tort claim generally.[32]

Notwithstanding the limited waiver of sovereign immunity provided herein, the state or agency or subdivision may agree, within the limits of insurance coverage provided, to settle a claim made or judgment rendered against it without further action by the Legislature, but the state or agency or subdivision thereof shall not be deemed to have waived any defense of sovereign immunity or to have increased the limits of its liability as a result of its obtaining insurance coverage for tortious acts in excess of $100,000 or $200,000 waiver provided above. The limitations of liability set forth in this subsection shall apply to the state and its agencies and subdivisions whether or not the state or its agencies or subdivisions possessed sovereign immunity before July 1, 1974.

**32.** Florida does preclude an award of prejudgment interest in both personal injury cases and those insurance cases derived from personal injury claims. *See, e.g., Cooper v. Aetna Casualty & Surety Co.*, 485 So.2d 1367 (Fla.App.Ct. 2nd Dist. 1986) ("[a]lthough the action was based upon a contract of insurance, it was still essentially one for the recovery of personal injury damages, and,

**1584**

*See, e.g., A.R.A. Serv., Inc. v. Pan American World Airways, Inc.,* 474 So.2d 396 (Fla.App. Ct. 3rd Dist.1985) ("prejudgment interest may be awarded where property damage is caused by an act of negligence ..."). Section 768.28(5) of the Florida Statutes, however, prohibits the recovery of prejudgment interest on tort judgments against the State or its agencies or subdivisions. Fla.Stat.Ann. § 768.28(5) ("The state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances, *but liability shall not include ... interest for the period before judgment.*") (emphasis added). Dade County qualifies as a subdivision for purposes of section 768.28(5). *See* Fla. Stat.Ann. § 768.28(2) ("As used in this act, 'state agencies or subdivisions' include.... counties ...."). As a result, the Court cannot award any prejudgment interest with respect to the jury's verdict in strict liability. Moreover, as noted previously, the Court declines to enter judgment with respect to the jury's verdicts in negligence and breach of contract. Plaintiffs' motion to determine date from which prejudgment interest should accrue is DENIED. The Court finds that Plaintiffs are not entitled to prejudgment interest.

accordingly, the [plaintiffs] were not entitled to prejudgment interest").