**AMERICAN EAGLE CREDIT CORPORATION,**
Plaintiff,

v.

**SELECT HOLDING, INC. et al., Defendant.**

**No. 88–2425–CIV.**

United States District Court, S.D. Florida, Miami Division.

July 21, 1994.

**804**

Alan M. Grunspan, Kaufman Miller Dickstein & Grunspan, P.A., Miami, FL, for plaintiff.

Marlene Kaplan, Key Biscayne, FL, Dean Roffers, Delray Beach, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

K. MICHAEL MOORE, District Judge.

This case came before the Court for a nonjury trial on Plaintiff American Eagle Credit Corporation's claims for damages for breach of a guaranty agreement and fraud. Having considered all the evidence, including the testimony of the witnesses, and being otherwise duly advised, the Court enters its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

### I. FINDINGS OF FACT

This action arises from the Plaintiff's claim that the Defendants defaulted on leases they entered into with the Plaintiff in 1987. The Plaintiff, American Eagle Credit Corp. ("American Eagle"), is a Delaware corporation engaged in the business of financing business equipment leases. Defendants Select Holdings, Select Restaurant Group, Inc. and Select Operations Group, Inc. ("the Select Group") are dissolved corporations that were engaged in the development of Dairy Queen franchises in Palm Beach and Broward counties.

Defendant Gerald Toberman ("Toberman") was a stock holder and corporate officer of the three Select Group companies at all pertinent times to this action. Toberman was Chairman of the Board, President, Director and sole stockholder of Select Holdings from January 1987 until August, 1988. Defendant Dean Roffers is a resident of the State of Florida. Roffers was the Secretary/Treasurer of Select Holdings and Select Restaurant Group, Inc. Defendant Perry Dhruve ("Dhruve") was a Florida citizen and was Vice–President and Treasurer of Select Restaurant Group, Inc. from January, 1986 until February, 1988, when he became President of Select Restaurant Group, Inc. Dhruve was the Vice–President of Select Holdings and Treasurer of Restaurant Structures and Design, Inc.

This Court has jurisdiction based upon the complete diversity of citizenship of the parties and because the amount prayed for exceeds $50,000. 28 U.S.C. § 1332.

In Count I of the Plaintiff's Third Amended Complaint (DE # 123), the Plaintiff asserts a claim for breach of contract against Select Holdings. In Count II, the Plaintiff alleges breach of guaranty against Toberman. Counts III, IV and V are claims for civil RICO under 18 U.S.C. § 1961 *et seq.* against all Defendants. Count VI is a claim for common law fraud against all the Defendants. Defendant/Counter–Plaintiff Toberman filed a counterclaim for recoupment of monies paid by him to American Eagle based upon alleged misrepresentations made to induce Toberman to enter into said lease agreements.

The Plaintiff dismissed counts III, IV and V and moved for a default judgment as to Count I, based upon Select Holdings' failure to answer the Complaint. The Plaintiff tried Count II for breach of guaranty and Count VI for fraud.

A default judgment was entered against Dhruve prior to trial for failure to answer or otherwise respond to the complaint. Defendant Claire Wright was dismissed from the case on the eve of trial. The trial proceeded against Defendant Toberman, who was represented by counsel, Dean Roffers, who appeared pro se, and Select Holdings, Inc., which was not represented.

American Eagle entered into contracts with the Select Group whereby American Eagle would purchase furnishings and other equipment for the Select Group's Dairy Queen restaurants and then lease the equipment to the Select Group for a monthly rent.

American Eagle at all times was the owner of the equipment and had the right to repossess it in the event of default. Toberman was the guarantor of nine of the leases.

In 1986, Roffers approached Toberman with a business proposition. Roffers and Druhve had obtained the rights to develop Dairy Queen franchises in Broward and Palm Beach counties. If Toberman would provide the capital, Roffers and Druhve would develop the restaurants and then sell them to sub-franchisees as turnkey operations. Toberman agreed.

The Select companies purchased an existing Dairy Queen restaurant in Palm Beach County and planned the development of two additional restaurants. Roffers and Dhruve needed financing for furniture and equipment for the two prospective Dairy Queens and the existing restaurant, which was in need of remodeling. They approached Harry Seidman ("Seidman"), American Eagle's Florida representative, in January 1987 to work out a deal. Seidman knew Roffers and Dhruve because they all shared office space in the same building. At Seidman's request, Roffers and Dhruve provided Seidman with financial information regarding Toberman, including financial statements and tax returns. In early February, 1987, Seidman met with Toberman several times to negotiate the terms of the equipment leases. Relying on Toberman's personal wealth, American Eagle submitted a written bid on the proposed equipment financing on February 20, 1987. The bid was accepted.

American Eagle then prepared leases for custom-made furniture and restaurant equipment that was to be produced by the vendor Designer Seating, Inc. ("Designer Seating"). The first eight leases were forwarded to Toberman in Minnesota for his signature on the personal guaranty portion of the leases. Toberman personally guaranteed each of the eight leases and returned them to the Florida offices of the Select Group. Dhruve signed the eight leases on behalf of the lessee, Select Holdings, on or about April 16, 1987. The eight leases were then forwarded to the American Eagle home office in Michigan where they were executed by American Eagle. The subject leases all provided that

Select Holdings would inspect each item of equipment to be purchased by American Eagle and notify American Eagle of any defects. Select Holdings was also to notify American Eagle of the Select Group's acceptance of the equipment and to maintain the equipment thereafter. The leases provided for late charges, default interest and attorneys' fees in the event of a default by the lessee. Default included, but was not limited to, failure to pay monthly installments due under each lease.

The leases also provided that the vendor was to be paid directly by American Eagle, that Select Holdings was to approve the delivery and installation of the equipment by execution of a Certificate of Delivery and Acceptance, that obligations under the lease were to be guaranteed by Toberman, and that the leases could not be modified except in writing.

The guaranties signed by Toberman all provided that Toberman unconditionally guaranteed Select Holdings' performance under each of the subject leases. Select Holdings had the full power and authority to modify, amend or extend any obligation under the subject leases without diminishing or discharging Toberman's liability as guarantor. American Eagle had no duty to advise Toberman regarding Select Holdings' financial condition. Toberman also expressly agreed to immediately reimburse American Eagle for all costs and expenses incurred in the enforcement of the guaranties, including attorneys' fees.

Sometime prior to April 20, 1987, Roffers asked Seidman to pay the vendor, Designer Seating, for the furniture. The furniture had been built, Roffers said, but there was no place to accept delivery because construction of the Dairy Queen stores was running behind schedule. According to Roffers, Designer Seating had to be paid to preserve a price discount previously given to Select Holdings.

Roffers and Dhruve asked Seidman if American Eagle could purchase the Designer Seating equipment prior to the delivery of the equipment to the sites. Select Holdings would inspect and accept the completed

equipment in Designer Seatings' Chicago warehouse. Upon notification by Select Holdings of its acceptance of the equipment, American Eagle would then pay the vendor Designer Seating for the purchase price under the leases.

Seidman testified that Toberman asked him if he could help with the situation by paying for the equipment. Toberman asked Seidman to "take care of it with the people in Florida," Seidman testified. Toberman testified that he could not recall the substance of any conversations he may have had with Seidman or other American Eagle representatives.

Seidman called David Townsend, ("Townsend") at American Eagle's home office in Michigan, and asked if the Select Companies could take delivery of the equipment at the vendor's Chicago warehouse. Townsend stated that he was concerned that the equipment might be damaged while in storage or in transit to Florida. Consequently, Townsend said American Eagle would only pay the vendors if the Select Companies signed a letter releasing American Eagle from liability for post-payment damage.

On or about April 20, 1987, but prior to funding, Select Holdings provided American Eagle with a hold harmless letter, with a copy to Toberman, unconditionally accepting the equipment and releasing American Eagle from any claims regarding damage to the Designer Seating equipment and furnishings after American Eagle had paid for them but prior to or during their shipment to Florida. Toberman later signed the letter, at the bottom, stating that he agreed "to hold American Eagle Credit Corporation harmless for any and all claims with regards to Delivery and Acceptance and location of equipment ..."

Dhruve executed separate delivery and acceptance certificates and forwarded them to American Eagle's Michigan office. Townsend contacted Toberman to confirm that Select Holdings had accepted the equipment and furnishings at the Designer Seating warehouse in Chicago. Townsend stated that Toberman told him it was "O.K. to pay." Townsend testified that he did not ask Toberman specifically if the equipment was in

Chicago because he did not feel it was necessary. Toberman testified that he did not believe the April 20, 1987 Hold Harmless letter altered the delivery location provided for by the leases. "I didn't know where [the equipment] was going to go," Toberman testified.

An unidentified American Eagle employee also called Select Holdings' office in Florida to confirm that the equipment had been accepted. Wright, as Secretary of Select Holdings, took the call, put the caller on hold, and asked Roffers about the status of the equipment. Wright testified that Roffers told her to tell American Eagle that all the equipment was in Chicago and had been accepted by Select Holdings at the Designer Seating warehouse. Wright then relayed this information to the American Eagle employee, who in turn informed Townsend.

In fact, there was no equipment at the Designer Seating warehouse in Chicago. No equipment had been built as of the time American Eagle issued checks in payment of the leases.

In reliance upon Select Holdings' representations that the leases had been funded, American Eagle paid for the equipment. American Eagle made eight checks payable to Select Holdings, Inc. and Designer Seating Company, as co-payees, including, a check dated April 22, 1987 in the amount of $24,349, two checks issued April 24, 1987 in the amount of $23,920.00, and $23,365.00 respectively, two checks issued May 3, 1987 in the amount of $22,989.00 and $23,809.00 respectively, a check issued May 11, 1987 in the amount of $23,890.60 and two checks issued May 15, 1987 in the amount of $20,032.00 and $24,953.00 respectively. American Eagle also issued a ninth check made payable to Select Holdings, Inc. and Restaurant Structures and Design, Inc. in the amount of $20,500.00.

Townsend testified that the checks were made out to Select Holdings and Designer Seating as co-payees to provide American Eagle with additional protection. By making the checks payable to both parties, American Eagle gave Select Holdings another opportunity to inspect the equipment before endors-

ing the checks, making them payable to the vendors Designer Seating and Restaurant Structures. Despite this protection, just the opposite occurred. All eight checks made payable to Designer Seating were endorsed by Ernesto Garcia of Designer Seating and deposited in the account of Select Operations, Inc. In his deposition, which was read into the record, Garcia testified that the signature on the checks was not his. Roffers testified he did not know how Garcia's signature got on the checks.

On or about April 20, 1987, prior to American Eagle funding the equipment leases, Roffers approached Seidman and told him that the Select corporations were short on cash, therefore the check which they had given American Eagle as a deposit for the leases would bounce. Toberman then called Seidman and asked Seidman if he could personally cover the deposit check for the American Eagle leases. Toberman said he would repay Seidman the next day. Seidman then personally made out a check for $12,000 to cover the deposit and Toberman repaid Seidman in full the following day with a check dated April 21, 1987. Regarding this particular event, Toberman stated in his deposition that he knew that Select was out of money at the time because "they were always out of money."

After the lease money was deposited in the Select Operations account, Select Operations issued three checks totalling $54,000 to Toberman. This was part of Toberman's business agreement with the Select Companies. Wright testified that Roffers told her when she was hired that "Toberman got a piece of the bank loans, a piece of everything that came in, in exchange for guaranteeing the loans."

The checks made out to Toberman were paid out of the Select Operations operating account at the Palm Beach Lakes Bank, some of which bounced but were ultimately replaced or paid, specifically check number 338 dated April 23, 1987 for $22,000, check number 340 dated April 23, 1987 for $10,000 and check number 370 dated May 5, 1987 for $22,000. The checks were paid by the Palm Beach Lakes Bank on April 29, 1987, May 5, 1987 and May 12, 1987, respectively. At the time of the payment of the three checks to Toberman, the only funds available in the Select Operations account were funds advanced by American Eagle for payment to the equipment vendor.

The remainder of the money advanced by American Eagle under the subject leases was used to pay the operating expenses of the Select companies, the salaries of Roffers, Dhruve and Wright and numerous personal expenses, such as the lease of a home and car leases.

On June 30, 1987, the last American Eagle lease, lease no. 87–0629–1366, reflecting the purchase of restaurant equipment from vendor Restaurant Structures and Design by American Eagle and the lease of the equipment to Select Holdings, was executed by Dhruve on behalf of Select Holdings. On that date, Select Holdings, through Dhruve, represented that the equipment from Restaurant Structures and Design had been inspected and accepted by Select Holdings. On July 1, 1987, American Eagle issued check number 1135 payable to Select Holdings and Restaurant Structures in the total amount of $24,500. That check was also deposited in the Select Operation group account and used by Roffers, Dhruve and the Select companies for operating expenses.

It is undisputed that the signature of Gerald Toberman on the guarantee of the June 30, 1987 lease is not genuine. However, Toberman subsequently ratified and affirmed his guarantee of this lease by issuing monthly payments after receiving an itemized list of the previous amounts due under each lease. Moreover, Toberman admitted he guaranteed the last lease in his response to Plaintiff's Request for Admissions, Number 39, (Pl.Ex. 83).

Select Holdings made timely payments under all nine leases until approximately September 1987, when Select Holdings defaulted by failing to make the payments due that month. On October 6, 1987, American Eagle made a demand in writing on Select Holdings and on Toberman under his personal guarantee. Seidman spoke to Roffers regarding late payments and Roffers told Seidman that the Select Companies had no money, thus

American Eagle would have to look to Toberman for payment. In response, Seidman threatened to repossess the equipment and sell it to repay American Eagle. Roffers then admitted that the equipment did not exist because it had never been manufactured.

After Seidman informed Townsend that American Eagle's restaurant equipment was never made, Townsend told Seidman to call Toberman. Seidman testified that Toberman did not sound surprised when he was told that the equipment did not exist, however Toberman denied that he was aware of the status of the equipment. Roffers testified he did not believe Toberman was aware that the equipment had not been manufactured.

On November 25, 1987, Toberman paid $11,205.85 to American Eagle to bring all nine leases current. In December, 1987, payment again was not timely made and the leases were again in default. Seidman and Toberman had numerous conversations regarding Toberman's obligation under the leases through April, 1988. The Plaintiff contends that it has suffered $261,768.58 [1] damages in unpaid principal lease payments, $28,265.32 in late charges, $84,759.28 in the loss of the value of the equipment, plus interest accruing at a rate of in 1.75 percent monthly.

## II. CONCLUSIONS OF LAW

### A. PLAINTIFF'S MOTION TO AMEND COMPLAINT

As a preliminary matter, the Court must consider the Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence (DE # 155) filed after the conclusion of the trial. The Plaintiff did not assert a vicarious liability theory against Toberman in Count IV alleging fraud in its Third Amended Complaint. Instead, the Plaintiff chose to construct a case of circumstantial evidence showing the Toberman must have known that the equipment financed by American Eagle was never manufactured, causing the Plaintiff to suffer damages.

On the eve of trial, the Plaintiff dismissed its claims against Claire Wright, the bookkeeper and corporate secretary for Select Holdings. Wright testified for the Plaintiff at trial. Wright produced documents, known as "recaps" that she prepared for Toberman each month. These recaps revealed that Toberman received a percentage commission for each loan he guaranteed. Toberman could not explain why he did not produce these documents in discovery.

The recaps bolstered the Plaintiff's circumstantial case against Toberman because they tended to show that Toberman was aware of the Select Companies' cash flow problems thus he knew, or should have known, that his April 1987 commissions were drawn from American Eagle funds designated to pay the furniture vendor.

Wright also testified that American Eagle telephoned her to confirm that the furniture had been inspected at the Designer Seating warehouse in Chicago and was found acceptable by the Defendants. Wright testified that she put American Eagle on hold and asked Roffers if the equipment had been manufactured and found acceptable by the Select Group. Roffers told her the furniture had been inspected in Chicago and was acceptable. In fact, Roffers was aware at the time that no furniture had been manufactured. Roffers testified that he did not recall making any statement regarding the completion of the furniture.

After the parties rested, they were permitted to make a brief closing argument to the Court. In its closing, the Plaintiff's counsel asserted a theory of vicarious liability based upon Wright's testimony that Roffers told her to tell American Eagle that the furniture had been inspected in the Chicago warehouse and found to be acceptable. The Defendant objected, stating that such a theory was never plead by the Plaintiff in its Third Amended Complaint. The Court granted the Plaintiff leave to file a Motion to Amend its pleadings to conform to the evidence presented at trial.

---

1. The Plaintiff originally contended that the unpaid lease principal amount was $283,768.58 but reduced the amount by $12,000 at trial to reflect the sum Toberman paid on the leases.

In its motion, the Plaintiff seeks to amend Count IV of its Third Amended Complaint by adding paragraph 68 as follows:

> Alternately, Defendant Toberman acted so as to make Roffers and Dhruve his apparent agents, and in so doing, became liable for their fraudulent conduct towards the Plaintiff. Moreover, Defendant Toberman ratified and approved the fraudulent acts of his apparent agents, Roffers and Dhruve, by manifesting an intent to, and in fact retaining the financial benefits of their fraudulent acts and is therefore liable for the fraud of his agents.

(Pl.Mot. to Amend, at p. 2). In its response, Toberman argues that he will be greatly prejudiced if the Court allows the Plaintiff to retroactively amend its pleading to include an entirely new cause of action against Toberman. "This is not the purpose of Rule 15(b) Fed.R.Civ.P. and should be summarily denied by this Court." (Def.Rep. to Mot. to Amend., at p. 2).

### B. FED.R.CIV.P. 15(b)

Occasionally, the evidence produced at trial may differ significantly from the theory of the case pursued by the parties. This is often caused by unexpected evidence unearthed through discovery. Consequently, it may become necessary to modify the pleadings to reflect the case presented in the courtroom. Rule 15(b) [2] is designed to make that possible. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1491.

Locking parties into the strict language of their pleadings creates a "tyranny of formalism" inhibiting courts from adjudicating cases upon their merits. *Id.,* citing *In re Santa Fe Downs, Inc.,* 611 F.2d 815, 817 (10th Cir.1980). Thus, amendments under Rule 15(b) prevent the necessity of holding a new trial when evidence in court supports an unpleaded theory. *Id.,* citing *Falls Indus., Inc. v. Consolidated Chem. Indus., Inc.,* 258 F.2d 277 (5th Cir.1958).[3]

■ The first section of Rule 15(b) states that issues not raised by the pleadings that are tried with the express or implied consent of the parties shall be treated as if they were pleaded in the complaint. The Plaintiff first asserted a vicarious liability theory for recovery in its closing argument. Toberman objected to such an amendment in his closing. Thus, the Court finds the issue was not tried with the express or implied consent of the parties.

■ If the new issues have *not* been tried with the express or implied consent of the parties, the court may amend the pleadings if (1) the party against whom the amendment is offered will not be prejudiced by the amendment and (2) the amendment should be permitted in the absence of such prejudice if it is in the interest of justice. *See Hillburn v. Maher,* 795 F.2d 252, 264 (2d Cir.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987).

■ At issue then, is whether the Defendant Toberman will suffer any prejudice if the Motion to Amend is granted and whether justice requires the amendment.

In his response, Toberman states the Plaintiff seeks to assert an entirely new cause of action against him. (Def.Rep. to Pl.Mot. to Amend, at p. 2). The Court disagrees. What the Plaintiff is attempting to do is assert a new theory of liability against Toberman. The underlaying claim for fraud against Toberman remains constant. Tober-

---

**2.** Rule 15(b) states: Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of those issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the 11th Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

man has been aware of this cause of action from the inception of this complaint and had a full and fair opportunity to prove that the evidence presented in the case does not constitute fraud. If Toberman is successful in persuading the Court that no fraud exists, then the Plaintiff's vicarious liability claim fails. These facts are not analogous to the Plaintiff seeking to assert an entirely new cause of action—for battery, for example—without providing the Defendant with an opportunity to present an adequate defense.

Moreover, the Court finds that Toberman presented evidence that would rebut the Plaintiff's contention that Roffers was Toberman's agent. Such evidence, if successful, would defeat the Plaintiff's vicarious liability theory. Toberman presented evidence that he was not Roffers and Dhruve's employer in support of his argument that he was unaware of the financial condition of the Select Group companies. The Defendant testified that he was simply a guarantor of loans for the Select companies.

■ Toberman had an opportunity to cross-examine Claire Wright and had incentive to discredit her testimony. Toberman's theory of the case, as stated in his opening, was that Roffers and American Eagle's Seidman conspired to "put a money man [Toberman] on the hook." This too would defeat a vicarious liability theory, which requires that a principal allow, or cause others to believe that an individual has authority to act on his behalf, inducing their detrimental reliance. *Fidelity & Casualty Co. v. D. N. Morrison Const. Co.*, 116 Fla. 66, 156 So. 385, 387 (1934).

Accordingly, the Court finds that Toberman will not suffer prejudice if the Complaint is amended, and that it is in the interest of justice to do so.

The Plaintiff's theory of its fraud claim against Toberman was based largely on circumstantial evidence. The Plaintiff relies on two direct statements from Toberman, which, it alleges, when considered in context demonstrate an intentional or negligent misrepresentation. The first is Toberman's statement to American Eagle's Townsend that it was "OK to pay" the vendor. The second, is Toberman's alleged request from Seidman

"can you take care of this for us?" The Plaintiff did not present evidence of a definitive statement of misrepresentation from Toberman, such as "the equipment has been manufactured. Please pay the vendor."

Wright testified that when American Eagle called the Select Group inquiring as to whether they should pay the vendor, Roffers told her to tell them that the equipment had been manufactured and inspected in Chicago, and that the vendor should be paid. Of the three statements alleged to be misrepresentations, Roffers' statement that the equipment had been manufactured is the least ambiguous. If Toberman cloaked Roffers in apparent authority to render him Toberman's agent, it would be unjust to permit Toberman to escape liability simply because he carefully worded his responses to the Plaintiff's inquiries into the status of the equipment. Accordingly, the Court finds that the interests of justice require an amendment of the pleadings. The Plaintiff's Motion to Amend is hereby GRANTED.

## C. COUNT I—BREACH OF GUARANTY

■ Florida law governs this action because the place of performance of the contract is in Florida. *See Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293 (5th Cir.1972); *Starkenstein v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 572 F.Supp. 189 (M.D.Fla. 1983).

■ It is undisputed that the leases are in default, triggering Toberman's obligation as guarantor. Toberman argues that he should be released from his obligation under the guaranty because the Plaintiff increased Toberman's risk without his consent. This is the generally accepted rule in Florida. *Equity Title, Inc. v. First Nat'l Bank & Trust*, 564 So.2d 1182 (Fla.Dist.Ct.App.1990); *Causeway Lumber Co. v. King*, 502 So.2d 80 (Fla.Dist.Ct.App.1987).

The leases guaranteed by Toberman required that the lessee certify that the equipment leased was delivered, approved and installed on the site. The leases also provided that the lessor, American Eagle, would pay the vendor directly for the equipment. Toberman argues that American Eagle materi-

ally altered these provisions when it (1) permitted the Select companies to accept delivery at the vendor's Chicago warehouse and (2) paid the vendor with checks made out to both the vendor and lessee.

Toberman contends that these modifications were made without his consent because each lease requires that all modifications must be made in writing. Toberman argues that the Plaintiff has not produced documentary evidence indicating that he agreed to the changes.

The Plaintiff contends that the April 20, 1987 Hold Harmless letter, signed by Toberman, is documentary evidence that he consented to the modification of the delivery location. The Plaintiff also argues that the dual payees was not a material alteration of the terms of the agreement and was, in fact, made to provide added protection to Toberman and the Select companies.

The Hold Harmless letter states that it reflects "unconditional acceptance by Select Restaurant Group, Inc. and Select Holdings, Inc. of any and all equipment Designers' [sic] Seating Co...." (Pl.Ex. 85A). That portion of the letter is executed by Claire Wright, as Secretary of Select Restaurant.

Beneath Wright's signature, Toberman assents to "the above conditions as stated by my employees" and that he agrees to "hold harmless any claims with regard to the *delivery and acceptance and location* of equipment." (emphasis added). Toberman testified that he believed the letter was redundant because the protections provided in the letter for American Eagle were already provided in the leases. He stated he did not believe the letter changed the location of delivery.

■ The letter's reference to holding American Eagle harmless from claims regarding "delivery and acceptance and location" of equipment does not, by its words alone, indicate that the place of delivery is to be changed from Palm Beach County to Chicago. In construing the provisions of a contract, including those purporting to modify a contract, the Court must place itself in the situation of the parties, and from consideration of the surrounding circumstances, and

apparent object of the parties, determine the meaning and intent of the language employed. *Connecticut General Life Ins. Co. v. Craton*, 405 F.2d 41 (5th Cir.1968).

■ American Eagle's Townsend testified that he requested the Hold Harmless letter in response to Roffers' request that American Eagle pay the vendor before the restaurants were ready for occupancy. American Eagle was concerned that the furniture might be defective or suffer damage either while in storage in Chicago or while in transit to Florida. Aside from arguing that the Hold Harmless agreement was redundant, the Defendant did not present any other credible reason why the Hold Harmless letter was executed.

Thus, the Court concludes that the reference to holding the plaintiff harmless for delivery and acceptance and location of equipment refers to changing the place of delivery. The Hold Harmless letter therefore satisfies the lease provision requiring that all modifications must be made in writing.

■ Toberman also argues that he did not agree to any modification of the lease terms, therefore he should be released from all obligations because the modifications increased his risk. However, Toberman was impeached on the issue of his awareness of the purpose of the Hold Harmless agreement at trial. While Toberman testified on the stand that he did not know why he was asked to sign the Hold Harmless letter, he had testified previously in his 1989 deposition that he believed the Hold Harmless letter related to changing the place of delivery. In his deposition, Toberman testified that "if we have some equipment built and it is not delivered into the location that the equipment was supposed to go because of the location not being ready, and the equipment may stay with the manufacturers until it's going to be delivered, something of that nature." (Toberman depo., at p. 7).

The Court finds as follows: (1) the Hold Harmless letter modified the delivery provision of the lease; (2) Toberman was aware of the modification and what effect it had on his risk as guarantor; and (3) Toberman con-

sented to the modification by executing the letter. Thus, this defense fails.

■ Toberman also argues that the law imposes on American Eagle as creditor, an obligation not to deal with the debtor or any security for debt in such a manner as to harm the interest of the guarantor. *Dorsy v. Maryland Nat'l Bank,* 334 So.2d 273 (Fla. Dist.Ct.App.1976). Toberman contends that the Plaintiff did this by agreeing to fund the lease while knowing that the Select companies were in poor financial health. This argument merits little discussion. The guarantee itself states that "the guarantor assume[s] the responsibility for keeping informed of the financial condition and circumstances of the Lessee and Lessor shall have no duty to advise the undersigned of information known to it regarding such condition or circumstances." (Lease Agreement, at p. 3).

■ Toberman makes a similar argument relating to the Plaintiff's failure to mitigate its damages. Toberman argues that the Plaintiff's decision to issue checks to co-payees indirectly caused its own damages because it permitted the Select companies to deposit funds earmarked for the vendor, directly into the Select Operations account. The evidence showed that the vendor's name had been forged on the checks.

■ American Eagle made the check out to both Select Holdings and the vendor specifically for the Defendant's protection. By making the check out to dual payees, Select Holdings had one additional opportunity to inspect the furniture for defects and damage prior to "signing off on the check" before paying the vendor. Toberman has cited no authority, and this Court is aware of none, imposing upon the lessor a duty to anticipate criminal acts of forgery by the lessee in order to mitigate damages against a guarantor. Toberman's counterclaim relates to his claim that because the Plaintiff misrepresented the delivery conditions and the status of the furniture, Toberman is entitled to recoup any monies he paid to American Eagle. For the reasons discussed above, the Court finds that Toberman's counterclaim is groundless.

Accordingly, judgment shall be entered for the Plaintiff on Count I. Judgment shall be entered for the Plaintiff on Defendant Toberman's counterclaim for recoupment of monies paid to American Eagle based upon the Plaintiff's alleged misrepresentation.

## D. COUNT VI—FRAUD

■ A plaintiff alleging a cause of action for fraudulent misrepresentation must prove the following: (1) a false statement of fact made by the defendant; (2) known to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) reliance by the plaintiff as to the correctness of the representation, and finally, (5) damage to the plaintiff resulting from that reliance. *Rudy's Glass Construction Co. v. Robins,* 427 So.2d 1051 (Fla. Dist.Ct.App.1983). The Plaintiff may rely on the truth of a representation, even though its falsity could have been ascertained had he investigated, unless he knows the representation is false or its falsity is obvious. *Besett v. Basnett,* 389 So.2d 995, 998 (Fla.1980).

■ The claim for fraud against Roffers is based upon his statement to Wright to tell American Eagle that the equipment had been manufactured, was inspected in the vendor's warehouse and was found acceptable by the Select companies, thus American Eagle should pay the vendor.

Applying the test for common law fraud to the facts at bar, the Court finds as follows. First, the statement made by Roffers was false. It is undisputed that the equipment had not been manufactured on or about April 20, 1988, at the time the leases were funded. Second, the falsity of the statement was known to Roffers at the time he made it. Although Roffers testified that he believed Toberman was not aware there was no equipment, Roffers did not deny that he was aware that there was no equipment. Third, the statement was made to induce the Plaintiff to act. American Eagle was not going to pay the vendor until American Eagle was assured that the equipment was accepted because the equipment was the Plaintiff's equity in the event the Defendant defaulted on the leases. Fourth, American Eagle relied upon Roffers' misrepresentation by pay-

ing the vendor. Fifth, American Eagle suffered damage as a result its reliance because when the Select companies defaulted on the loans, American Eagle could not sell the equipment to pay off the balance on the leases.

Finally, American Eagle was under no duty to investigate whether the equipment had been manufactured because it had no reason to know of the falsity of Roffers' statement and its falsity was not obvious. *See Besett, supra.*

The Court finds that the Plaintiff has established the elements of fraud as to the Defendant Roffers. Accordingly, judgment shall be entered against Roffers for Count IV.

The Plaintiff also seeks to impose liability against Toberman for Roffers' misrepresentation on a vicarious liability theory. Toberman specifically denies that Roffers and Dhruve were his agents, contending that his involvement was solely as a guarantor for loans related to their independent business.

 In Florida, actual authority is not required to establish an agency relationship. Under the doctrine of apparent authority, an agency relationship will arise when the principal allows or causes others to believe that an individual has authority to conduct a certain act. *See Borg–Warner Leasing Div. of Borg–Warner Acceptance Corp. v. Doyle Electric Co.,* 733 F.2d 833, 836 (11th Cir. 1984), citing *Fidelity & Casualty Co. v. D.N. Morrison Construction Co.,* 116 Fla. 66, 156 So. 385, 387 (1934); *City Nat'l Bank v. Basic Food Industries, Inc.,* 520 F.2d 336, 337 (5th Cir.1975). *See also Overseas Private Inv. Corp. v. Metropolitan Dade County,* 826 F.Supp. 1564 (S.D.Fla.1993). If the principal is silent, apparent agency can still arise when the principal by its actions creates a reasonable appearance of his agent's authority. *Id.,* citing *Stiles v. Gordon Land Co.,* 44 So.2d 417, 421–22 (Fla.1950).

 In opposition to the Plaintiff's Motion to Amend, Toberman argues that there was no evidence introduced at trial indicating that Roffers and Dhruve were his employees. The Court disagrees. The April 20, 1987 Hold Harmless letter, signed at the bottom by Toberman on April 30, 1987, states specifically "I do hereby agree to the above conditions *as stated by my employees.*" (emphasis added).

In response, Toberman argues that (1) the letter was never introduced by the Plaintiff to establish a vicarious liability theory and (2) the letter was on corporate letterhead and signed by Claire Wright.

 As to the first argument, the reason for the letter's introduction does not restrict this Court from interpreting the plain meaning of its terms. At trial, Toberman assailed the letter on various grounds, including his contention that although he admitted to signing and dating the letter on April 30, 1987, he believed the letter was supposed to be locked away and not released. The Court rejects this argument. As to the second argument, while it is true that the letter is written on Select corporate letterhead and signed by Wright, the portion referring to "my employees" is beneath Wright's signature, and is specifically signed and dated by Toberman. This Court is satisfied that sufficient evidence has been presented to justify the conclusion that Toberman represented to American Eagle, either explicitly or implicitly, that the Select Group's officers, including Roffers and Dhruve, were his employees, and thus his agents.

However, even ignoring the express terms of the April 20, 1987 Hold Harmless letter, the Court finds additional evidence in the record to indicate that Toberman cloaked Roffers and Dhruve with apparent authority. According to American Eagle's Seidman, when Roffers and Dhruve told him the vendor wanted to be paid and that the equipment would remain in the Chicago warehouse, Toberman told Seidman to "take care of it with the people in Florida." The people in Florida are Roffers and Dhruve. Toberman's statement clearly indicates his desire to delegate the responsibility for handling all problems to Roffers and Dhruve. Moreover, Toberman cannot argue that his relationship with the Select companies is solely based upon his guaranty. Toberman was the Chairman of the Board, the president, di-

rector and sole shareholder of Select Holdings.

Accordingly, the Court finds that Toberman cloaked Roffers and Dhruve in apparent authority.

 A principal is civilly liable for the tortious acts of his agents which are found to be within the course and scope of the agent's employment. *Gates v. Utsey*, 177 So.2d 486 (Fla.Dist.Ct.App.1965); *Van Engers v. Hickory House, Inc.*, 104 So.2d 843 (Fla.Dist.Ct. App.1958); *City of Green Cove Springs v. Donaldson*, 348 F.2d 197 (5th Cir.1965). The tortious acts may be fraudulent. *West Florida Land Co. v. Studebaker*, 37 Fla. 28, 19 So. 176 (1896); *Donner v. Morse Auto Rentals, Inc.*, 147 So.2d 577 (Fla.Dist.Ct.App.1962). The principal's knowledge of the tortious act is irrelevant. *Wheeler v. Baars*, 33 Fla. 696, 15 So. 584 (1894).

 Roffers' statement that the equipment was manufactured and had been inspected and approved, was made within the course and scope of Roffers' employment because it furthered the interests of the Select companies by enabling them to use the money they fraudulently obtained to pay salaries and operating expenses. It cannot be argued that Roffers was acting outside the scope of his employment because the Select companies' stated purpose was to develop Dairy Queen restaurants for subfranchisees. The statement to American Eagle regarding the funding of the equipment leases advanced the Select companies' restaurant development agenda.

Accordingly, the Court finds that Toberman is liable for Roffers' fraudulent statement under a vicarious liability theory.

## E. DAMAGES

### 1. DEFAULT AND BREACH OF GUARANTY CLAIMS

 Plaintiff is entitled to a judgment against Defendant Toberman under his guaranty of all nine leases. As to Toberman's written guaranties of the first eight leases, specifically, lease numbers 87–0416–1090, 87–0416–1091, 87–0417–1092, 87–0417–1093, 87–0416–1086, 87–0416–1087, 87–0416–1088 and 87–0416–1089, Toberman admits to executing the written guaranties of each of the said leases. There is no dispute that the leases are in default and Toberman has failed to make good on his guaranties. Toberman's Affirmative Defenses and counterclaim all fail for the reasons discussed, *supra*.

 As to the last lease, lease number 87–0629–1366, it is undisputed that Toberman's signature appearing on the lease is a forgery. However, the Court finds that Toberman ratified and affirmed his guaranty of this lease by personally making several monthly payments under his guaranty of the lease to keep it current.

In the event of late payments or default, the lease states that the lessee promises to pay a late charge to the lessor or its assigns of "ten (10) cents per one dollar ($1.00) of each delayed payment or twenty-five dollars $25.00), whichever is greater." (Lease, at par. 21). The lease also calls for "interest to the Lessor upon each delayed payment calculated at the rate of one and three quarters (1.75%) percent per month." (Lease, at par. 21). In the event of default, interest shall accrue "thereafter up to and including the date of trial or entry of judgment." (Lease, at par. 22). The Default provision of the lease also permits the Lessor to take immediate possession of the equipment, without notice. (Lease, at par. 22).

Accordingly, Plaintiff is entitled to judgment on Count II against Toberman as guarantor in the amount of $473,475.71. That sum includes $283,768.58 in unpaid principal lease payments on the nine leases, plus $88,-682.53 in interest, calculated at a rate of 1.75 percent per month through the date of this judgment, plus $28,265.32 in late charges and $84,759.28 for the combined value of the equipment.

Defendant Select Holdings, Inc. was properly served but failed to file a responsive pleading. Thus, a default judgment shall be entered against Select Holdings for default under the leases for $473,475.71.

### 2. FRAUD

 Neither party in this action has addressed the issue of what effect Florida's

Economic Loss Rule ("the rule") has on the Plaintiff's claim for damages on Count VI for fraud. The Economic Loss Rule bars recovery in tort in an action when damages flow from a breach of contract, absent a showing of personal injury or property damage. *AFM Corp. v. Southern Bell Tel. & Tel. Co.*, 515 So.2d 180 (Fla.1987), citing *Florida Power & Light Co. v. Westinghouse Electric Corp.*, 510 So.2d 899 (Fla.1987). The tort claim must be "distinguishable from or independent of [the] breach of contract." *Id.* at 181.

■ If a claimant does not have a contractual remedy because no contract exists, then this lack of an alternative means of recovery provides a claimant with an exception to the economic loss rule. *See Interstate Sec. Corp. v. Hayes Corp.*, 920 F.2d 769, 777 (11th Cir.1991); *Latite Roofing Company v. Urbanek*, 528 So.2d 1381 (Fla.Dist.Ct.App. 1988).

The Court finds that the damages alleged by the Plaintiff are based on breach of contract, arising from Select Holdings' default on the contract and Toberman's breach of his guaranty obligation. There is no claim that the Defendants' fraudulent acts caused either personal injury or property damage to the Plaintiff. If the Plaintiff claims that it has suffered property damage because its property in this action, i.e. the equipment, was never manufactured, the Court finds that the Plaintiff is already provided an adequate remedy under the leases. As discussed above, the Court's damage calculations on the breach of contract and breach of guaranty counts include the combined value of the equipment.

■ In the context of fraud, courts have held that the Economic Loss Rule does not apply to a cause of action for fraud in the inducement because such claims arise prior to the formation of a contract. However, the rule does bar tort recovery for claims for fraud in the performance. In those circumstances, the contract dictates the rights and liabilities of the parties. *Brass v. NCR Corp.* 826 F.Supp. 1427, 1428 (S.D.Fla.1993), citing *Williams Elec. Co. v. Honeywell, Inc.*, 772 F.Supp. 1225, 1238 (N.D.Fla.1991).

■ The Court finds that the tort of common law fraud alleged in Count VI does not allege fraud in the inducement of the contract but instead alleges fraud in the performance. The Plaintiff contends that it entered into the contract with the Defendants based upon Toberman's wealth and ability to live up to his guaranty in the event of default. The Plaintiff alleges that after it entered into the contract, it was induced to perform its payment obligation based upon the Defendants' fraud.

The Plaintiff argues that the damages caused by the fraud are separate and distinct from the breach of guaranty. American Eagle contends that it is entitled to damages in excess of $1 million as a direct result of the Defendant's fraud because it was unable to repackage the leases as securities for sale to third parties.

■ Under tort actions, victorious plaintiffs are entitled to two possible measures of damages. The first is the "out of pocket rule," which seeks to restore the plaintiff to the position it would have been in absent the fraud by providing his out of pocket losses. *Nordyne, Inc. v. Florida Mobile Home Supply, Inc.*, 625 So.2d 1283, 1287 (Fla.Dist.Ct.App.1993). The second, and less common approach, is known as the "benefit of the bargain rule," which permits the plaintiff to recover for future lost profits. *Id.* at 1287, citing *Martin v. Brown*, 566 So.2d 890, 891 (Fla.Dist.Ct.App.1990). The benefit of the bargain rule may be used when a court finds that the out of pocket rule will fail to provide the plaintiff with an adequate recovery. *Id.* at 1287.

■ Benefit of the bargain damages are not commonly awarded in tort actions. For recovery in tort, "there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects." *Casa Clara v. Charley Toppino and Sons*, 620 So.2d 1244 (Fla.1993), *quoting Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 414, 441 N.E.2d 324, 327 (1982).

■ The Court does not find that benefit of the bargain recovery is appropriate in this

action. First, and most importantly, the Court finds that an adequate remedy is provided by the contract governing the parties' rights and obligations. Second, the amount of the future profits have not been established with sufficient certainty. The resale of an equipment lease depends on the market for such an instrument. The Plaintiff did not introduce evidence proving that a market existed for such leases at the time of the fraud or at what price the Plaintiff could have sold such leases. In contrast, the court in *Nordyne* found that adequate evidence existed to show that but for Nordyne's fraudulent misrepresentations, the Defendant would have continued to enjoy specific profits for the ensuing five years. *Id.* at 1287. Thus, the Court finds that the Plaintiff is limited to recovering its out of pocket losses under the contract and guaranty.

Based upon the foregoing, the Plaintiff's damage recovery on its fraud count is precluded by the Economic Loss Rule.

In sum, the Court finds that the Plaintiff has proven, by a preponderance of the evidence, that the Defendant Toberman breached his guaranty obligation under the nine leases that are the subject of this action. Accordingly, the Defendant Toberman is liable to the Plaintiff for a sum of $473,475.71. Select Holdings is also liable to the Plaintiff for a sum of $473,475.71 for default on the leases. The Court finds for the Plaintiff on Defendant/Counter–Plaintiff Toberman's counterclaim for recoupment of monies paid by him to American Eagle.

DONE AND ORDERED.