**SFC VALVE CORPORATION, Plaintiff,**

v.

**WRIGHT MACHINE CORPORATION, et al., Defendants.**

**No. 88–6847–Civ–Moore.**

United States District Court, S.D. Florida, Miami Division.

March 29, 1995.

Rudolph F. Aragon, Jeffrey B. Crockett, Aragon, Martin, Burlington, Weil & Crockett, P.A., Miami, FL, Rudolph Garcia, Patricia A. Trujillo, Mark C. Levy, Saul, Ewing, Remick & Saul, Philadelphia, PA, for plaintiff.

John Hargrove, Eugene Lewis Heinrich, Heinrich, Gordon, Batchelder, Hargrove & Weihe, Fort Lauderdale, FL, for defendants.

## ORDER

K. MICHAEL MOORE, District Judge:

This case causes the Court to revisit Florida's evolving economic loss rule.

## I. Factual Background

Sfc Valve Corporation ("Sfc") is a government contractor that supplies the United States Navy with high-pressure, high-temperature valves for use in submarines. Sfc got into the valve business in May 1986, when it purchased the assets of the bankrupt Southern Fluid Controls Corporation, Inc. ("Southern"). One of these assets was a valve supply contract between Southern and the Navy. Sfc, Southern and the Navy agreed to a novation whereby Sfc was substituted for Southern in this contract.

Sfc's contract with the Navy soon hit a snag. Unknown to Sfc, one of Southern's subcontractors, Worcester Taper Pin Corporation ("Worcester"), had sold falsely certified valve stems to Southern. Southern, not knowing better, had incorporated those valve stems into some of the valves it had furnished to the Navy.

Worcester's miscertification of the valve stems was no small matter. These valve stems were considered "Level 1" components. The Navy's specifications for Level 1 components stated that the components would be "used in a crucial shipboard system. The use of incorrect or defective material would create a high probability of failure resulting in serious personal injury, loss of life, loss of vital shipboard systems or loss of the ship itself." For this reason, raw materials used to make Level 1 components were subject to strict requirements designed to ensure that the components could withstand shipboard heat and temperature stresses.

Worcester developed an internal quality control program to meet these requirements. Under this program, Worcester's purchasing manager[1] tagged raw materials arriving from a mill according to type, size and heat lot. The purchasing manager also verified all incoming mill certifications of raw materials. When materials were disbursed to Worcester's machining area, their heat lot numbers were transferred onto tickets and tags that accompanied the materials throughout the manufacturing process. The goal of Worcester's program was to permit the materials present in a finished valve stem to be traceable to their original mills and mill certifications.

Southern submitted a purchase order for 10,800 Level 1 valve stems to Worcester in 1984.[2] The purchase order required Worcester to send Southern a certification of any heat treatment and a copy of the original mill certification for raw materials used in the valve stems. When Worcester shipped the order to Southern, however, it failed to include the required certifications. Southern quickly notified Defendant G. Lee Schwartz[3] of this error. Schwartz could not find these documents. Consequently, to complete the sale, he falsified mill and heat treatment certifications and sent them to Southern. Southern then accepted the valve stems.

Nobody would have been the wiser for Schwartz's deception had not Southern filed for bankruptcy reorganization in 1985. Because Southern had not completed many of its contracts with the Navy, Sfc saw an opportunity to take these contracts over. Sfc investigated Southern's operations and the value of Southern's assets; and, based on the results of that investigation, purchased Southern's assets.

Sfc discovered the falsified certifications in September 1986 and promptly notified the Navy. The Navy responded by temporarily debarring Sfc as a contractor pending an investigation of the certifications and Sfc's operations. Sfc lost over one year of business as a result of this suspension, and it filed suit in 1988 against Defendants for its economic losses. Its four-count complaint alleged breach of contract, racketeering, fraud and negligence claims against Defendants.

In 1989, Sfc reopened Southern's closed bankruptcy case to determine the status of any causes of action Southern might have

---

**1.** Defendant Paul McCrohon was Worcester's purchasing manager.

**2.** The original purchase order requested 5,800 valve stems. Southern amended this order by requesting an additional 5,000 valve stems.

**3.** Schwartz was Worcester's sales manager.

had against Worcester—now Defendant Wright Machine Corporation ("Wright")[4]— for its failure to comply with Southern's purchase order. The bankruptcy court decided to auction off any claims Southern had in order to collect additional monies for the bankruptcy estate. In the bidding, Wright offered $118,000; Southern offered the greater of $30,000 or 5% of any recovery against Wright. The bankruptcy court accepted Wright's offer and transferred to Wright:

> any and all causes of action, claims, demands, and choses in action ... which [Southern] presently has, or may have, arising out of, created, or caused by the actions or failure to act of ... Wright or Worcester, their officers, directors, or employees, and which arose at any time during the past contractual business dealings and commercial relationships between [Southern] and ... Wright or Worcester.

This Court subsequently entertained a motion for summary judgment by Defendants against all four counts of the complaint. The Court granted summary judgment in favor of Defendants on Sfc's contract claim because Wright's purchase of Southern's causes of action had extinguished whatever contract remedies Sfc may have otherwise had. The Court also granted summary judgment on the racketeering count, holding that Sfc lacked standing to prosecute this claim.

The Court declined to award summary judgment on the fraud and negligence claims, despite Defendants' argument that they were barred by Florida's economic loss rule. The Court held that Sfc's tort claims were independent of any breach of contract remedy that Southern had possessed because Sfc had suffered an independent, noncontractual injury as a result of Wright's false certification of its valve stems. This independent injury was the temporary loss of the Navy contract.

Defendants continued to pursue their economic loss rule defense throughout this litigation, arguing that new law required judgment against Sfc. The Court rejected each of these efforts. On the eve of trial, Defendants tried once more by moving in limine for dismissal on the basis of the economic loss rule. Proving that persistence pays, the Court now agrees that the economic loss rule bars Sfc's claims as they are pled in Sfc's amended complaint.

## II. Discussion

Although styled as a motion in limine, Defendants' motion is in essence a motion for summary judgment directed against Sfc's fraud and negligence claims. Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To obtain summary judgment, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

In assessing whether the movant has met this burden, the Court views the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* The party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Id.* at 160, 90 S.Ct. at 1610. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the nonmoving party has introduced no evidence whatsoever. *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368–69 (11th Cir.1982).

### A. The economic loss rule

Florida has adopted the "economic loss rule," which provides that "a plaintiff

**4.** Worcester merged to become Wright. Wright later sold its assets and its name to a division ("New Wright") of a third company, Memry Corporation. Wright adopted a new name, "WMC Liquidation Corporation," and later merged into Cartec, Inc. All of these corporations are Defendants. For convenience, the Court will refer collectively to the corporate Defendants—including Worcester—as "Wright."

may not raise tort claims to recover solely economic damages arising from a breach of contract absent evidence of personal injury or property damage." *Jones v. Childers,* 18 F.3d 899, 904 (11th Cir.1994). Economic losses "are disappointed economic expectations," such as "damages for inadequate value, costs of repair and replacement of [a] defective product, or consequent loss of profits." *Casa Clara Condominium Assoc., Inc. v. Charley Toppino & Sons, Inc.,* 620 So.2d 1244, 1246 (Fla.1993) (internal quotations omitted).

Defendants contend that Sfc's tort claims fall within the economic loss rule. Their argument is straightforward: Sfc's tort claims seek recovery of economic losses arising from the falsification of the Level 1 certifications. Because Southern's purchase order (*i.e.,* contract) required Wright to provide valid certifications with the valve stems, falsification of the certifications constituted a breach of contract. Defendants may not recover in tort for economic losses arising from this breach.

Sfc responds that the economic loss rule is inapplicable for two reasons: (1) Sfc has no alternative, non-tort cause of action against Defendants to recoup its losses; and (2) Sfc's injuries resulted from conduct by Defendants that was independent of Wright's breach of contract. The Court will examine each of these arguments.

### 1. Absence of alternate remedy

■ Sfc was not a party to Southern's contract with Wright [5], and it has no contractual claims against Defendants because Wright purchased all of Southern's causes of action. Sfc also cannot sue Southern because Southern is defunct. Sfc's tort claims against Defendants thus are its only remedies for its losses—a fact Sfc believes is sufficient to remove the bar of the economic loss rule.

Florida law is unclear as to this contention. Prior to 1993, the Eleventh Circuit held that Florida's economic loss rule did not bar tort recovery where a plaintiff lacked an alternate, contractual remedy. *Interstate Secs. Corp. v. Hayes Corp.,* 920 F.2d 769, 777 (11th Cir.1991). In 1993, however, the Florida Supreme Court's seminal *Casa Clara* opinion disapproved of a Florida Court of Appeal decision recognizing the "no alternate remedy" exception to the economic loss rule. *Casa Clara,* 620 So.2d at 1245 (disapproving of *Latite Roofing Co. v. Urbanek,* 528 So.2d 1381 (Fla.Ct.App.1988)). Although *Casa Clara* did not explicitly announce an end to the "no alternate remedy" exception, its disavowal of *Latite* was sufficiently troubling to cause the Eleventh Circuit to ask the Florida Supreme Court to address the exception's continued viability. *Airport Rent–A–Car, Inc. v. Prevost Car, Inc.,* 18 F.3d 1555, 1556–57, 1559 (11th Cir.1994) (question certified to Florida Supreme Court).[6]

In the face of this uncertainty, the Court makes its best *Erie* assessment, *see Perkins v. Hartford Ins. Group,* 932 F.2d 1392, 1395 (11th Cir.1991), to conclude that *Casa Clara* has extinguished the "no alternate remedy" to the economic loss rule. The facts of *Casa Clara* itself strongly suggest this result. In *Casa Clara,* homeowners brought negligence claims against a materialman that had supplied concrete to general contractors who had built the plaintiffs' homes. The concrete had contained a high content of salt, which caused reinforcing steel to rust. This, in turn, caused the concrete to crack and erode.

The concrete supplier argued that the economic loss rule barred the homeowners' negligence claims. The Florida Supreme Court agreed. The court pointed out that the defendant had supplied concrete pursuant to contracts and that the homeowners sought recovery of only economic losses. It then observed:

---

**5.** The absence of contractual privity between Sfc and Defendants does not bar application of the economic loss rule. *Hoseline, Inc. v. U.S.A. Diversified Products, Inc.,* 40 F.3d 1198, 1200 (11th Cir.1994).

**6.** *Airport Rent–A–Car* indicates that this Court relied prematurely upon *Interstate Secs.* and *Latite* to state in *dicta* in *American Eagle Credit Corp. v. Select Holdings, Inc.,* 865 F.Supp. 800, 815 (S.D.Fla.1994), that a "no alternative remedy" exception to the economic loss rule continues to exist.

The purpose of a duty in tort is to protect society's interest in being free from harm, and the costs of protecting society from harm is borne by society in general. Contractual duties, on the other hand, come from society's interest in the performance of promises. When only economic harm is involved, the question becomes whether the consuming public as a whole should bear the cost of economic losses sustained by those who failed to bargain for adequate contract remedies.

*Id.* at 1246–47 (internal citations and quotations omitted). Finding that a homeowner's "economic disappointment" with a house that failed to meet expectations was "a core concern of contract, not tort law," *id.* at 1247, the court concluded that the concrete supplier could not be liable for "negligently" failing to perform its contractual obligation to supply adequate concrete.

The Florida Supreme Court's reasoning in *Casa Clara* is applicable regardless of whether a plaintiff has a contractual alternative to suing in tort: parties in commercial transactions—rather than the tort system—are responsible for allocating the risk of, and remedying, economic losses.[7] In fact, recognition of a "no alternative remedy" exception cuts against the purpose of the economic loss rule. As two commentators have explained:

> [T]he economic loss doctrine is aimed at encouraging parties to negotiate for warranty protection or to take other steps, such as purchasing insurance, to protect their purely economic interests. If the [no alternate remedy] rule were taken to its logical extreme, a purchaser could voluntarily relinquish its right to sue its privy in contract by agreeing to purchase a product "as is" in return for a rock-bottom price, but then rely on *Latite* to argue that it must be entitled to sue its privy or others in the chain of production in tort because it has "no alternative remedy," even though

it consciously chose to forego its contract remedy. Such a result not only would permit the purchaser to deceive the seller into giving it the lowest price, denying the seller the benefit of the bargain, it would also all but destroy the economic loss doctrine.

Wagner & Solomon, "Finally a Concrete Decision: The Supreme Court of Florida Ends the Confusion Surrounding the Economic Loss Doctrine," 68 *Fla.B.J.* 46, 51 (May 1994).

This reasoning is particularly compelling under the circumstances of this case. Sfc had an opportunity to obtain a contractual remedy: it could have purchased Southern's contract claims against Wright in Southern's bankruptcy proceeding. But it did not. Instead, Defendants outbid it for only $118,000—despite the fact that Sfc seeks to recover over $2 million in economic losses. Permitting Sfc to circumvent the economic loss doctrine because it lost this auction would deprive Defendants of the benefit of their purchase and reward Sfc for failing to protect itself.

A recent decision of the Eleventh Circuit confirms this view. In *Hoseline, Inc. v. U.S.A. Diversified Products, Inc.,* 40 F.3d 1198 (11th Cir.1994), an auto parts manufacturer ("Hoseline") contracted with another company ("USA") whereby USA would provide wire harness loom to Hoseline. After three years of doing business under this agreement, Hoseline discovered that USA was charging for nearly double the amount of loom that it actually was shipping. Hoseline thus sued USA for breach of contract and sued USA's owner for fraud and civil theft. When USA filed for bankruptcy, Hoseline abandoned its contract cause of action but pursued its claims against the owner. The district court subsequently entered a directed verdict against these claims based on the

7. Of course, the *Casa Clara* opinion makes no suggestion that the economic loss rule applied only because the plaintiffs had an alternate means of recovering their economic losses. Further, it is possible that the homeowners did not have an alternate remedy. The homeowners had no direct contract rights against the concrete supplier. *Id.* at 1249 (Shaw, J., concurring and dissenting) ("It works a mischief, where as in

this instance the injured party is not privy to the contract...."). In addition, it is not apparent that the homeowners' claims against the general contractors with whom they did contract were viable. There is no indication, for example, that the general contractors remained solvent or otherwise financially able to fully compensate plaintiffs for their losses.

economic loss rule, and the court of appeals affirmed.

*Hoseline* is very close factually to the present case. Like Sfc, the plaintiff in *Hoseline* was foreclosed from prosecuting a contract claim because of the bankruptcy of the breaching party. Despite the absence of an alternate remedy, however, the Eleventh Circuit applied the economic loss rule. This Court sees no distinguishing facts in this case that require a different result.

The Court thus concludes that the economic loss rule bars Sfc's claims regardless of whether Sfc has an alternate remedy for its economic losses. *Accord Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill.Dec. 689, 692, 503 N.E.2d 246, 249 (1986) ("A plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract.").

### 2. Defendants' commission of independent tort

■ Sfc also contends that Defendants engaged in negligence and fraud independent of Wright's breach of its contract with Southern. The economic loss rule does not apply "where a tort independent of [a] breach of contract [has been] committed." *Greenberg v. Mount Sinai Med. Center of Greater Miami, Inc.,* 629 So.2d 252, 255 (Fla.Ct.App. 1993). A tort is independent of a breach of contract if the facts comprising the breach are not relied upon to establish the elements of the tort. *See id.*

#### a. Negligence

Sfc argues that Defendants' false certification of Level 1 components created a "foreseeable zone of risk" that persons other than Southern would detrimentally rely on the certifications. Sfc purportedly entered this zone when it purchased Southern's assets. Defendants' failure to warn it, Sfc concludes, constitutes negligence independent of any breach of contract.

Sfc is wrong. Florida's Third District Court of Appeals recently rejected this reasoning in *Palau Int'l Traders, Inc. v. Nar-cam Aircraft, Inc.,* 653 So.2d 412 (Fla.Ct. App.1995). In *Palau,* the plaintiff ("Palau") contracted with a company ("International Airlines") to purchase a used airplane, which Palau needed to transport fish for sale in Japan's sushi market. Although the plane was under Peruvian registry, Palau's contract required International Airlines to place the plane under United States registry and to obtain an FAA certificate of airworthiness.

The defendant ("Narcam") was hired for this purpose. A third party leasing the plane from International Airlines contracted with Narcam to perform the repairs, maintenance, and inspections on the plane necessary to obtain an airworthiness certificate. Narcam furnished these services, entered a maintenance release in the airplane's logbook, completed an application for an airworthiness certificate, and verified that the plane had been inspected and had been found airworthy. Palau purchased the airplane two days later, and the FAA issued an airworthiness certificate shortly thereafter.

Cracks in the airplane's landing gear, resulting from extensive corrosion, manifested six months later. Believing that the corrosion had been present when Narcam had conducted its inspection, Palau sued Narcam and International Airlines for the cost of repairs to the airplane, loss of the use of the plane, and consequential damages. Palau subsequently settled with International Airlines, leaving only negligent repair and negligent misrepresentation claims remaining against Narcam. Narcam moved for summary judgment on the basis of the economic loss rule, and the trial court granted its motion.

On appeal, Palau argued that the economic loss rule did not apply because it was "a third party who foreseeably sustain[ed] an economic loss proximately caused by the negligent performance of Narcam . . . ." *Id.,* 653 So.2d at 414. The Court of Appeal disagreed. Emphasizing that Palau could have protected itself against its economic losses, the court stated:

[T]here were several ways the buyer in this case could have taken steps independently to protect itself. For example, the buyer could have hired its own mechanic to

perform maintenance and inspections on the airplane rather than rely on the seller's mechanic. Under those circumstances, the buyer would have a contractual remedy directly from its own mechanic. Alternatively, the buyer, particularly in a large commercial transaction as in this case, could have protected his interests by negotiation and contractual bargaining or insurance with the seller. The buyer also has the choice to forego warranty protection in order to obtain a lower price. These alternatives illustrate that although the buyer's expectations of the airplane were not met, any damages could have been remedied if the buyer had purchased insurance, paid for a warranty, or directly contracted with the airplane mechanic. To expand negligence law under the facts of this case would result in providing the buyer with a remedy against Narcam without consideration, that is of longer duration and greater financial impact than the remedy the buyer contracted for with the seller in the first place.

*Id.*, 653 So.2d at 416 (citations omitted).

Sfc's "zone of risk" theory also runs counter to *Casa Clara.* As the dissent in that case stated:

I feel that the theory [supporting the economic loss rule] is stretched when it is used to deny a cause of action to an innocent third party who the defendant knew or should have known would be injured by the tortious conduct. [The concrete supplier] knew that the concrete that was the subject matter of the bargain between [it] and the general contractor would be incorporated into homes that would be bought and occupied by innocent third parties.

620 So.2d at 1249. Like Sfc, the *Casa Clara* homeowners were within a "foreseeable zone of risk" of harm resulting from the concrete supplier's negligence. The Florida Supreme Court nevertheless barred tort recovery.

■ These cases identify a fundamental reason why Sfc's "foreseeable zone of risk" negligence theory is inconsistent with the economic loss rule. As stated above, the rule

is designed to force parties in a commercial transaction to look *outside* of the tort system for protection against economic losses. *See Hoseline*, 40 F.3d at 1199 (the rule "encourages parties to negotiate economic risks through warranty provisions and price"). As *Palau* made clear, parties can protect their economic interests through a variety of mechanisms: they can, for example, bargain for warranties, purchase third-party insurance, or self-insure against losses. Requiring parties to take such precautions is more cost effective than providing "insurance" against economic losses through the tort system, *see* Priest, "The Current Insurance Crisis and Modern Tort Law," 96 *Yale L.J.* 1521, 1552–63 (1987); and, absent physical injury or property damage, there is no reason for society to assume the costs of providing such "insurance." *Casa Clara*, 620 So.2d at 1247.

The Court concludes that Sfc's negligence claim is barred by the economic loss rule.

### b. Fraud

Sfc also alleges that it was induced to purchase Southern's assets by Defendants' failure to disclose the falsification of the certifications and Defendants' affirmative misrepresentations of the value of Southern's assets. According to Sfc, this fraudulent conduct occurred well after Wright's initial breach of contract and, therefore, constitutes an independent tort.

■ To the extent that Sfc can prove that Defendants made affirmative misrepresentations that induced Sfc to purchase Southern's assets, Sfc likely can establish a fraud claim that is independent of Defendants' breaching conduct. *See Warren v. Monahan Beaches Jewelry Center, Inc.*, 548 So.2d 870, 873 (Fla. Ct.App.1989).[8] If so, the economic loss doctrine will not bar such a claim. *See American Eagle Credit Corp. v. Select Holding, Inc.*, 865 F.Supp. 800, 815 (S.D.Fla.1994).

The procedural posture of this case is not appropriate to consider this possibility, however. Sfc's fraud claim, as currently pled, relies exclusively on the falsification of the

---

8. However, unless Sfc can explain why Wright, a third party to the sale of Southern's assets to Sfc, had a duty to disclose its earlier breach, the mere failure to disclose cannot create an independent tort that avoids the economic loss rule.

**718**

certifications as the basis for recovery against Defendants. As explained above, breach of contract conduct cannot alone give rise to a tort claim. The Court thus will grant Sfc leave to amend its fraud claim to conform to this opinion.

### III. Conclusion

The Court grants Defendants' motion in limine. Summary judgment is entered against Sfc's negligence claim. Sfc's fraud claim is dismissed without prejudice. Sfc is granted 10 days from the date of this order to file a second amended complaint amending its fraud claim in a manner consistent with this opinion.